**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **JOSHUA ROY MOSES**<br>*Plaintiff*,<br>**v.**<br><br>**JAMIE SORBER, et al.**<br>*Defendants*. | **CIVIL ACTION NO. 22-3385** |

**MEMORANDUM RE: MOTIONS FOR SUMMARY JUDGMENT**

**Baylson, J.** **August 24, 2026**

**TABLE OF CONTENTS**


I. INTRODUCTION .......... 2
II. UNDISPUTED MATERIAL FACTS .......... 3
A. Plaintiff's Medical Condition .......... 3
B. Structure of the DOC .......... 4
1. Commonwealth Defendants .......... 6
2. Medical Defendants .......... 9
C. Plaintiff Enters DOC Custody .......... 9
1. SCI-Smithfield .......... 9
2. SCI-Camp Hill .......... 10
D. Plaintiff's Transfer to SCI-Phoenix .......... 11
1. January 2022 Emergency Room Visits .......... 13
2. Plaintiff's Single Cell Approval .......... 15
3. Plaintiff's November 2022 GI Consult .......... 16
4. Plaintiff's February 2023 GI Follow-Up .......... 19
5. Plaintiff's June 2023 Colonoscopy .......... 20
6. Plaintiff's October 2023 Colonoscopy .......... 21
7. Plaintiff's Bathroom Pass Approval .......... 22
8. Plaintiff's March 2024 GI Follow-Up .......... 23
9. Plaintiff's April 2024 Infirmary Visit .......... 24
10. Plaintiff's June 2025 GI Follow-Up .......... 27
III. PROCEDURAL HISTORY .......... 29
IV. LEGAL STANDARD – SUMMARY JUDGMENT .......... 30
V. EIGHTH AMENDMENT CLAIMS .......... 31
A. Count I: 42 U.S.C. § 1983 – Eighth Amendment – Cruel and Unusual Punishment .......... 32
1. Defendant Benning-Smith .......... 34
2. Defendant Long .......... 38
3. Defendant Sorber .......... 41
4. Defendant Terra .......... 45
5. Defendant Sipple .......... 47

6. Defendant Huner ........ 52
7. Defendant LeClerc ........ 56
8. Defendant Letizio ........ 56
9. Defendant Bora Saika ........ 64
10. Defendant Walsh ........ 64
B. Count II: 42 U.S.C. § 1983 – Eighth Amendment – Supervisory Liability ........ 67
1. Defendant Benning-Smith ........ 68
2. Defendant Long ........ 74
VI. FIRST AMENDMENT CLAIMS ........ 78
A. Count IV: 42 U.S.C. § 1983 – First Amendment Retaliation as to Defendant Walsh ........ 79
1. Defendant's Contentions ........ 79
2. Plaintiff's Contentions ........ 80
3. Analysis ........ 81
B. Count IX: 42 U.S.C. § 1983 – First Amendment Retaliation as to Defendant Letizio ........ 82
1. Defendant's Contentions ........ 82
2. Plaintiff's Contentions ........ 83
3. Analysis ........ 84
VII. ADA / RA CLAIMS ........ 85
A. Count V: Title II of the ADA, 42 U.S.C. § 12132 ........ 87
1. Defendant DOC ........ 87
2. Defendants Benning-Smith, Long, Terra, and Sipple ........ 100
B. Count VI: Section 504 of the RA, 29 U.S.C. § 794 ........ 101
1. Defendant's Contentions ........ 101
2. Plaintiff's Contentions ........ 101
3. Analysis ........ 102
VIII. STATE LAW CLAIMS ........ 103
A. Count VII: Professional Negligence and Vicarious Liability under Pennsylvania State Law ........ 103
1. Defendant Long ........ 103
2. Defendant LeClerc ........ 106
3. Defendant Letizio ........ 106
4. Defendant Bora Saika ........ 108
IX. CONCLUSION ........ 108

## I. INTRODUCTION

This action was brought by Plaintiff, Joshua Roy Moses ("Plaintiff"), against Defendants Pennsylvania Department of Corrections ("DOC"), Benning-Smith, Long, Sorber, Terra, Sipple, Huner, LeClerc, Letizio, Bora Saikia, and Walsh, alleging violations of his rights under the First Amendment and Eighth Amendment; Title II of the Americans with Disabilities Act ("ADA"), 42

U.S.C. § 12132, and Section 504 of the Rehabilitation Act ("RA"), 29 U.S.C. § 794; and Pennsylvania state law. ECF 81; ECF 132.[1]

For the following reasons, Commonwealth Defendants' Motion (ECF 155) is **GRANTED IN PART AND DENIED IN PART**, Medical Defendants' Motion (ECF 157) is **GRANTED IN PART AND DENIED IN PART**, and Plaintiff's Motion for Partial Summary Judgment (ECF 159) is **GRANTED IN PART AND DENIED IN PART**.

## II. UNDISPUTED MATERIAL FACTS

The following is a fair account of the material factual agreements at issue in this case, as taken from all parties' Statements of Fact ("SUMF") and briefs as well as the deposition transcripts and discovery documents reviewed by the Court.[2] Where there are facts in dispute, the Court notes such below. See Coulston v. City of Philadelphia, No. CV 23-4077, 2025 WL 2377676, at *2 (E.D. Pa. Aug. 15, 2025) (**Baylson, J.**).

### A. Plaintiff's Medical Condition

Plaintiff was incarcerated in the Pennsylvania DOC from September 8, 2021, to July 8, 2025. Prior to his incarceration in 2009, Plaintiff sustained multiple gunshot wounds to his lungs, liver, kidney, small intestine, colon, knee, and buttocks. As a result of his injuries, Plaintiff had to have portions of his small and large intestines removed. Plaintiff now has chronic gastrointestinal ("GI") conditions that cause him frequent and sudden diarrhea, severe abdominal pain, nausea,

[1] As noted throughout this Memorandum, Commonwealth Defendants include Defendants Long, Benning-Smith, Terra, Sorber, Sipple, Huner, and the DOC. Medical Defendants include Defendants Walsh, Letizio, LeClerc, and Bora Saikia.

[2] See ECF 156 (Commonwealth Defs.' SUMF); ECF 158 (Medical Defs.' SUMF); ECF 160 (Plf's SUMF); ECF 165 (Commonwealth Defs.' Response to Plf's SUMF); ECF 167 (Plf's Additional SUMF and Responses to Defs.' SUMF); ECF 172 (Commonwealth Defs.' Response to Plf's Additional SUMF); ECF 177 (Medical Defs.' Response to Plf's Additional SUMF).

and other symptoms. Plaintiff's condition cannot be completely cured. Plaintiff states that treatment for his conditions should be overseen by a specialist for continuity of care and may require a "trial and error" approach to diet and medication.

Plaintiff states that he requires easy access to a toilet due to his condition, and it is difficult for him to wait to use the toilet. When Plaintiff had a cellmate, he would have to wait until the shared toilet was available to relieve himself. Plaintiff also alleges that attempting to wait to use the toilet is painful, so at times he tried to force a bowel movement when the toilet was available. Plaintiff further states that his cellmates would become upset with him for his frequent use of the toilet and for the impact it had on them and would be physically attacked or prevented from eating at times. Plaintiff manages his condition by eating specific foods that he can tolerate and avoids large portions but sometimes fasts so he does not need to use the bathroom as frequently.

**B. Structure of the DOC**

The DOC is an agency of the Commonwealth of Pennsylvania that is responsible for the operation of Pennsylvania's state prisons and receives federal funding. The DOC contracts with Wellpath to provide medical care to inmates. When inmates want to access medical services for non-emergency conditions, they must utilize the "sick call" process. Providers were instructed to limit each sick call to "one issue" to allow for more social distancing during the COVID-19 pandemic, as well as inmates could not be seen when "a certain number of inmates" were "sucking all the resources of the provider's time through the day to not be able to get through sick call." ECF 160-7 ("Huner Dep.") at 66:14–67:20. Providers could use their discretion as to when and how to enforce the "one issue" policy.

However, specialist care is provided either through outside visits or via telemedicine visits conducted on site. Requests for specialist care must be approved by a collegial review process

through Wellpath, and there is no DOC oversight in this process. For offsite care, Wellpath is responsible for paying treatment-related costs, but the DOC pays for transportation and security-related costs. Generally, providers attempted to schedule specialist appointments within 60 days, but there were "COVID backlogs" and community providers could be booked out for months. ECF 160-3 ("Benning-Smith Dep.") at 55:1-4. Defendant Long also testified that Wellpath had control over what providers they could call to see if they had appointments. ECF 160-4 ("Long Dep.") at 71:1-12.

Medications are provided either as "keep on person" ("KOP") or "direct observation therapy" ("DOT"), the latter of which requires the inmate to go to the medical department and receive each dose from a staff member.

Inmates' electronic medical records follow the inmate to each new facility, so it contains records from throughout the inmates' time in the DOC. DOC staff members involved in medical care have access to these medical records. Additionally, if inmates believe they are not receiving adequate medical care, they must speak with the medical providers and/or file a grievance.

In SCIs-Phoenix, Camp Hill, and Smithfield, inmates are typically housed two to a cell with one toilet. The DOC can provide incarcerated individuals with a "Z-Code," which means they have a single cell and do not have to share with another inmate. A Z-Code may be based on certain medical conditions and can be assigned at any time. An inmate may also request to be reviewed for Z-Code status. However, if there is an obvious demonstrated need, the consideration for Z-Code status need not wait until a regularly scheduled annual review.

At SCI-Phoenix, recreation takes place in the dayrooms, unit yards, or main yards. There are no toilets in the dayrooms or unit yards, and the main yards currently have one shared toilet each. When inmates are out of their cells for recreation, they can only return to their cells at certain

times, and, if they do, they must then remain in their cells until the midpoint ("halftime") of the recreation period (or for the remainder of the recreation period if halftime has passed). Accordingly, an inmate could miss some activities when they go into their cell to use the bathroom.

The DOC also has a policy, DC-ADM 006, regarding accommodations for inmates with disabilities, and contains a formal procedure for inmates to request disability accommodations. Per DC-ADM 006, "[a]ny observing staff member can make a request for accommodation on behalf of an inmate" and when reviewing a request, staff members can note an accommodation that could be added. However, Defendant Huner testified that the "onus was on the inmate to request the accommodation." Huner Dep. at 131:3-7, 132:23–133:1. Defendant Huner testified that inmates with obvious, instantly recognizable needs, such as blind or deaf inmates, would not need to request accommodations through this process. Id. at 133:1-25. But she also testified that even an inmate in need of a cane would have to go through sick call. Id. at 134:19-24.

**1. Commonwealth Defendants**

Defendant Erica Benning-Smith is the Director of the DOC's Bureau of Healthcare Services ("BHCS"). She was the acting director from March 2021 to April 2022, and became the director in April 2022. BHCS's role is to develop policies for medical care across the DOC, such as contract management of vendors, coordinating medical services for quality and contractual compliance, Quality Improvement ("QI"), inmate grievances and correspondence, ADA requests, and infection control. BHCS also reviews grievances that are referred to it by the Secretary's Office of Inmate Grievances and Appeals ("SOIGA"). Defendant Benning-Smith testified that in her role, she does not oversee any Wellpath employees. Benning-Smith Dep. at 26:3-4. She also testified that BHCS does not have any responsibilities regarding special diets and any grievances concerning special diets went to Food Services, even if the special diet is for a medical condition.

Id. at 102:2–105:19. She further testified that Dietary could deny a diet that is prescribed by a doctor and the dieticians have final approval of diets. See id.

Defendant Benning-Smith testified that no DOC employee has any involvement with the specialist care approval process. Id. at 52:16-23. Defendant Benning-Smith also testified that her role in the grievance process is administrative, as she simply reviews to ensure all grievance questions are answered. Id. at 122:11–124:2. She testified that she does not make the clinical decisions nor any decisions regarding the outcome, and the final decision in clinical matters is the Chief of Clinical Services. See id.

Defendant Ronald Long was the Chief of Clinical Services for the DOC from June 2021 through November 2024. Defendant Long is a medical doctor and is board-certified in family medicine. As Chief of Clinical Services, he was responsible for "look[ing] over the entire health care of all the correctional units," addressing "any of the problems that were brought about from the different institutions," "[w]orking closely with the vendor and the state medical director for the vendors," and assisting with formulating policies and procedures. He was the highest-ranking medical professional employed by the DOC. Moreover, Defendant Long oversaw reviewing second-level appeals of grievances and determining what the response should be. He testified that, as part of the grievance process, he repeatedly reviewed Plaintiff's medical records and determined to his own satisfaction that the care was reasonable and appropriate. Long Dep. at 155:4-19, 164:11-23, 183:24–184:8, 216:6-15. He would not speak with the inmate, although "if there were a case that I was concerned about, I would be on the phone with [Wellpath's statewide medical director, Dr. Jay Cowan,] for him to review that case to see if he could get involved with it." Id. at 112:6-18. Defendant Long also testified that neither he nor BHCS had any power over how and

if Plaintiff's bathroom pass would be used or tell staff to let Plaintiff use the toilet whenever needed. Id. at 181:20-24, 184:22–185:23.

Defendant Jamie Sorber was the Superintendent of SCI-Phoenix when Plaintiff arrived in November 2021 and remained in that position until October 2022. In his role, he reviewed disability accommodation requests. He also reviewed grievance appeals submitted by inmates that were not satisfied with the initial responses. However, Defendant Sorber testified that he is not a medical professional, did not make clinical decisions, and would defer to the judgment of medical professionals. ECF 160-5 ("Sorber Dep.") at 102:13–103:2, 155:22–156:6.

Defendant Joseph Terra is the Superintendent of SCI-Phoenix and has been since October 2022. He was previously a Deputy Superintendent at SCI-Phoenix. Defendant Terra is not a medical professional, and he testified that, as Deputy Superintendent, he was not responsible for medical care or supervising the medical department. ECF 160-6 ("Terra Dep.") at 17:11-14, 17:24–18:8. He testified that any decision regarding offsite specialist care would come from a medical provider, not him. Id. at 50:24–51:14. He further testified that "[u]nless I see something seriously occurred, I have to let people in their profession dictate what needs to happen with certain things. I can't override a clinical person on medical needs." Id. at 136:2-5.

Defendant Brittney Huner has been employed by the DOC as the Corrections Health Care Administrator ("CHCA") of SCI-Phoenix since 2019. As the CHCA, Defendant Huner is responsible for coordinating the disability accommodation request process and responding to Inmate's Request to Staff Forms regarding disability accommodations. She testified that she is "not a medical person" and does not have a medical license. Huner Dep. at 26:14-15. She further testified that she has no power to decide whether an inmate needs specialist care, as that decision is made by the medical provider. Id. at 83:16-20. Defendant Huner also testified that the site

medical director was the only person with the authority to prioritize offsite treatments, and no DOC staff can prioritize an appointment. Id. at 202:11-21.

Defendant Mandy Sipple is the Deputy Superintendent for Centralized Services at SCI-Phoenix. From July 2018 through January 2023, Defendant Sipple's responsibilities included oversight of medical care at SCI-Phoenix and the contract with Wellpath LLC. Her role also included responding to inmate grievances and requests. However, Defendant Sipple testified that she is not a medical professional and could not provide medical opinions. ECF 160-8 ("Sipple Dep.") at 47:16. She also testified that she did not have the power to prioritize which inmates would be transported to offsite medical appointments when there were limitations on the ability to transport people, as that power belonged to the site medical director. Id. at 30:5-7, 31:2-16.

**2. Medical Defendants**

Defendant Anthony Michael Letizio was employed by Wellpath as the site medical director at SCI-Phoenix. He testified that in this role, he supervised all nurse practitioners and physician assistants at SCI-Phoenix. ECF 160-12 ("Letizio Dep.") at 42:5-23.

Defendant Joseph Walsh was employed by Wellpath as a physician assistant at SCI-Phoenix. Defendant Walsh testified that his supervisor at SCI-Phoenix was originally Dr. Weiner, then another doctor whose name he forgot, then Defendant Letizio, who was still the supervisor when Defendant Walsh retired. ECF 160-13 ("Wash Dep.") at 51:16-24.

**C. Plaintiff Enters DOC Custody**

**1. SCI-Smithfield**

Plaintiff first entered DOC custody on September 8, 2021, at SCI-Smithfield. On September 9, 2021, medical staff conducted an initial intake and noted a history of gunshot wounds, a partial colectomy, and chronic small bowel obstructions, as well as past symptoms

including weight loss, loss of appetite, heartburn, diarrhea, constipation, and dizziness/fainting. See generally ECF 158-1 ("Plf's Medical Records"). They further noted Plaintiff's "current diagnoses" of GERD and "[s]hort gut intestine" [sic] and his need for an abdominal binder. The plan was to request outside surgical records from Temple University, "follow up labs and chronic clinic at next site," and placed orders for medications. Plaintiff was restricted to low bunk housing and was provided with a cane for mobility.

While at SCI-Smithfield, Plaintiff was seen by medical providers several times for his GI symptoms, including spasms, abdominal pain, weight loss, vomiting blood, and difficulty digesting food. Plaintiff was concerned about a bowel obstruction. On exam, the provider noted that Plaintiff was in no acute distress, and he denied any current issues with difficulty moving bowels or breathing. The plan was to continue medications and monitor Plaintiff's weight. Plaintiff was also encouraged to notify medical of any acute issues.

**2. SCI-Camp Hill**

On October 6, 2021, Plaintiff was transferred to SCI-Camp Hill. While at SCI-Camp Hill, Plaintiff reported GI symptoms including diarrhea, fecal incontinence, vomiting, constipation, gas, chest pain, and bloating. See generally Plf's Medical Records. Plaintiff alleges these symptoms made sharing a toilet with a cellmate difficult. He was seen by providers several times, where they ordered different prescriptions and Ensure, recommended ongoing weight monitoring, and placed orders for new labs. Plaintiff was advised to avoid milk and excessive fiber since it would likely exacerbate his symptoms. Plaintiff also was referred to psychology, recommending that he should be evaluated for anxiety as a "common cause" of belching.

On November 2, 2021, Plaintiff alleges he submitted an Inmate Disability Accommodation Request Form, in which he asked to be assigned to a single cell due to his GI condition and

symptoms. Plaintiff alleges he did not receive a response and on November 10, 2021, submitted an Inmate's Request to Staff Member about this issue. Deputy Superintendent Nicklow responded on November 16, 2021, and stated that Plaintiff did not have a medical recommendation for a single cell, and it should be addressed through his unit. ECF 160-18. On November 18, 2021, Plaintiff submitted a grievance stating, "I have no control over my bowels and cannot share a cell with another inmate." ECF 160-17 at 2 (Grievance # 955035). RN Supervisor Comer responded, stating that "I have not been able to locate" the Disability Request, and it was possible that it did not reach CHCA Herb. Id. at 1. The Response further states that "medical does not have the authority" to determine a single cell and Plaintiff would need to discuss it with his unit manager, and that "incontinence, solely, [would] not grant you the ability for a single cell." Id.

**D. Plaintiff's Transfer to SCI-Phoenix**

On November 22, 2021, Plaintiff was transferred to SCI-Phoenix. A history of multiple gunshot wounds and chronic GI conditions was noted, and his restrictions included ground-level and bottom bunk housing. Plaintiff also had a prescription for an abdominal binder.

On November 24, 2021, Plaintiff submitted an Inmate's Request to Staff to Defendant Huner. ECF 160-19. In this Request, Plaintiff explained his GI conditions, requested to be housed in a cell alone, and asked for his abdominal binder and GERD medications to be replaced. Id. RN Monique Savage, who was supervised by Defendant Huner, responded on December 3, 2021. Id. In her response, RN Savage states that Plaintiff should see sick call for evaluation, as he has an "active order for a replacement abdominal binder and KOP Protonix given on 12/03/21 30 day supply." Id. RN Savage did not address Plaintiff's request for a single cell.

On December 3, 2021, Plaintiff submitted an Inmate Disability Accommodation Request Form to Defendant Huner. ECF 160-21 at 6. In the Disability Request, Plaintiff discusses his GI

conditions and requests to be housed in a cell alone. Id. Plaintiff did not explicitly ask for a bathroom pass in this Request. See id.

Between November 2021 and January 2022, Plaintiff was regularly seen at sick call, where he complained about GI symptoms, including heartburn, gas and soft/running bowel movements. See generally Plf's Medical Records. Plaintiff also noted that he should not be in a cell with anyone and needed to have a single cell. Id. For example, on January 3, 2022, CNRP Tara Jackson told Plaintiff that he did not meet the criteria for a single cell, after speaking with Defendant Letizio, who told her that Plaintiff did not meet the criteria for one. Id. at 124. Defendant Letizio, however, determined that Plaintiff did not meet the criteria without reviewing his medical records, examining him, or conducting any follow-up questioning.

Also between November 2021 and January 2022, Plaintiff filed several grievances, complaining about medical treatment and stating that he filed prior grievances and requests detailing the need to see qualified specialists and be housed in a single cell. See, e.g., ECF 160-20 (Grievance # 956926); ECF 160-22 (Grievance # 957742). These grievances were mostly rejected and/or denied, as "[g]rievances based upon different events must be presented separately," "there was no record of Plaintiff being seen by any provider on that date" and Plaintiff "received appropriate medical care." ECF 160-20 at 2 (Grievance # 956926); ECF 160-22 at 8 (Grievance # 957742). In her review, Defendant Sipple also stated that Plaintiff's "overall goal was to obtain a single cell, which has been denied as you do not meet the criteria." ECF 160-22 at 8 (Grievance # 957742). On appeal, Defendant Sorber upheld the initial response, finding that Plaintiff received appropriate medical care. ECF 160-20 at 1 (Grievance # 956926); ECF 160-22 at 6 (Grievance # 957742). On May 12, 2022, SOIGA upheld the response, stating "[t]hey found no evidence of wrongdoing." ECF 160-22 at 1–2 (Grievance # 957742).

Nevertheless, in at least one instance, the DOC upheld in part Plaintiff's grievance. For example, in response to Plaintiff's December 20, 2021, grievance, RN Savage upheld it in part, writing that there was a sick call delay on December 15, 2021, and the Wellpath Manager and CHCA Huner were made aware of this. ECF 160-23 ("Plf's Exhibit 22") at 8 (Grievance # 960646). Plaintiff appealed this grievance, in which he again explained his condition and requested a single cell. Id. at 7. Upon review, Defendant Sorber upheld the response, and stated that "[c]oncerns related to January 2022 incident dates will not be addressed … as it was not raised in the initial grievance." Id. at 6. Defendant Sorber did not address the request for a single cell. See id. Defendants Benning-Smith and Long reviewed Plaintiff's final appeal and concurred with RN Savage's initial response but did not address Plaintiff's request for a single cell. Id. at 1–2.

### 1. January 2022 Emergency Room Visits

On January 5, 2022, Plaintiff was transported to Einstein Medical Center for complaints of abdominal pain and bloating. See generally Plf's Medical Records. A CAT scan revealed an ileus.[3] On January 6, 2022, Plaintiff was cleared to return to SCI-Phoenix, and it was recommended that he follow up with Temple University Trauma Clinic within 3 to 5 days. Plaintiff was not taken to Temple following his discharge from Einstein, although Defendant Letizio testified that he believed that following up with trauma was not in Plaintiff's best interest and decided to have him follow up with a gastroenterologist to establish care. Letizio Dep. at 115:14–117:2. Plaintiff was a no-show for sick call on January 7, 2022.[4] Plaintiff filed a grievance

[3] Ileus is a condition where the intestines are unable to contract and move waste out of the body normally. See ECF 81, ¶ 143.

[4] However, there were instances where the medical providers were marking inmates as no shows at sick call, but the units were never called. Plf's Additional SUMF, ¶ 112; ECF 167-8 ("Plf's Exhibit 47").

relating to this, which Defendant Huner upheld in part, admitting that no follow-up appointment at Temple was scheduled. ECF 167-7 ("Plf's Grievances") at 17–18 (Grievance # 962828).

On January 19, 2022, Dr. Robinson saw Plaintiff regarding his emergency room visit and intestinal obstruction. The plan was "As per doctor's orders/anticipate Collegial Review prior to GI consult," "Reassurance and observation," and "Follow up PRN." On January 25, 2022, Plaintiff was a no-show for a scheduled visit with Dr. Saeed Bazel, and the plan was to reschedule the visit.

On January 26, 2022, Defendant Walsh saw Plaintiff at sick call. See generally Plf's Medical Records. Plaintiff complained about having difficulty digesting food and that he could not control his bowels. Plaintiff asked why he had not seen the specialist at Temple and inquired about the results of a recent ultrasound. Defendant Walsh brought Plaintiff's concerns to Defendant Letizio's attention and noted that a consult request for Temple gastroenterology had been submitted.[5] However, Defendant Walsh's clinical notes state that Plaintiff was in "no distress" and Plaintiff did not have blood in his vomit. Defendant Walsh further noted that Plaintiff was "upset" about not having a "private toilet." The plan was to continue drinking Ensure, taking medication, and follow up in the MD line to address Plaintiff's multiple GI complaints.

On January 31, 2022, Plaintiff was transported to Temple University Emergency Department for a possible bowel obstruction.[6] See generally Plf's Medical Records. Plaintiff reported abdominal pain, diarrhea, and intermittent vomiting. Plaintiff was admitted and remained at Temple until his discharge on February 5, 2022. While at Temple, Plaintiff had abdominal X-

[5] Defendant Letizio testified that a request was submitted that day. Letizio Dep. at 119:9-24. Plaintiff disputes this fact, stating that the first consult request was not placed until February 24, 2022. Plf's Additional SUMF, ¶¶ 130–31. However, the Court finds that this dispute is not material.

[6] Bowel obstructions can occur when an ileus progresses without improving, and can cause a risk of bowel perforation, sepsis, and death. See Plf's Additional SUMF, ¶ 122.

rays, a colonoscopy, and an upper endoscopy. The procedures revealed no signs of upper GI obstruction, "salmon colored mucosa susp[ected] for [B]arretts," "mild to moderate chronic nonspecific inflammation" in the small intestine, stomach, and colon, and "moderate chronic carditis in the esophagus." Additionally, Plaintiff's colonoscopy was normal.

On February 5, 2022, Plaintiff returned to SCI-Phoenix in good condition with an order for Protonix and was placed in the infirmary for observation. The next day, Defendant Walsh saw Plaintiff. Plaintiff made no complaints about abdominal pain, was in no distress, and was moving his bowels and bladder without difficulty. Defendant Walsh put him on a motility drug.

On February 7, 2022, Defendant Letizio saw Plaintiff in the infirmary. Defendant Letizio noted that Plaintiff appeared very well, denying any chest pain, shortness of breath, or any acute abdominal pain, although his bowel sounds were "somewhat hyperactive." Plf's Medical Records at 88–90. Following an exam, the plan was to discharge Plaintiff from the infirmary with renewed medications, await the pathology results, place a consult requesting a follow-up visit with the gastroenterologist, and educate Plaintiff to eat smaller bites and take a little more time to chew and swallow his food to improve digestion. Id.

**2. Plaintiff's Single Cell Approval**

Also on February 7, 2022, Defendant Letizio requested a single cell for Plaintiff, writing that "it would benefit [him] to have a single cell for his physical ailments and also his mental stability." Id. at 90. Defendant Letizio thought a single cell was "very appropriate given the fact that [Plaintiff] has had multiple occasions having bowel movements accidentally on himself while he waits for his cellmate to get off of the toilet." Id.

On February 8, 2022, Defendant Sorber reviewed Plaintiff's December 2021 Disability Request and wrote to BHCS that "an ADA accommodation is recommended for a single cell (Z

Code) due to his [g]astrointestinal issues." ECF 160-21 at 4–5. Defendants Benning-Smith and Long reviewed Plaintiff's Disability Request and approved it, as BHCS reviewed requests for approval after receiving the facility's recommendation. Id. at 1-3. On March 3, 2022, Defendants Sorber and Sipple sent a memo to Plaintiff stating that the Inmate Disability Accommodations Committee had "approved the accommodation request for a single cell (Z code) due to documented gastrointestinal issues."

**3. Plaintiff's November 2022 GI Consult**

Between February 2022 and December 2022, Plaintiff was regularly seen at sick call by medical providers for complaints of GI symptoms, including abdominal cramps, abdominal spasms, diarrhea, and complications digesting food. See generally Plf's Medical Records. Plaintiff was given medication, monthly weight orders were placed, X-rays were taken, and a request for Ensure was approved. Plaintiff's pathology reports from his colonoscopy at Temple were reviewed. Providers noted, however, that Plaintiff's complaints often did not correlate with his clinical presentation. See generally Plf's Medical Records. Defendant Letizio also requested a GI consult on May 23, 2022, which on September 8, 2022, Sheron Sanders, a clinical coordinator for Wellpath, noted on the consultation form: "Since this is not an urgent request and [Plaintiff] is not having issues—will schedule when cancer treatment [patients] decrease." Id. at 354. The appointment was scheduled for November 22, 2022. Plaintiff, however, filed at least two grievances, alleging that he was still experiencing symptoms, providers had refused to address them based upon the "one issue" per sick call policy, and he was "erroneous[ly]" charged a co-payment. Plf's Grievances at 31–38 (Grievance # 970150), 39–46 (Grievance # 970572).

Furthermore, Plaintiff had a nutritional assessment completed for a therapeutic diet, and was recommended to have a high protein, low carbohydrate diet. Plf's Medical Records at 56–57,

77–80, 82–83. However, Dietician Anne Brown stated that the "request for a non-standard diet needs to be clarified as it is unclear what is being requested," that "additional information [was] necessary prior to diet modification," and Plaintiff's needs were "unable to be fully evaluated at this time." See id. Dietician Brown also reviewed Plaintiff's commissary orders, and it was noted that Plaintiff made large purchases of items that would likely exacerbate symptoms of short bowel syndrome, such as sugar sweetened beverages and cereals, pastries, pies, candy, ramen, fish, seeds, and cheese.[7] See id.

In at least one sick call visit, Plaintiff requested a bathroom pass. For example, on June 8, 2022, PA Vanessa Amoah Oti-Akenten saw Plaintiff at sick call. Id. at 60–61. There, Plaintiff requested a bathroom pass due to difficulty getting to his cell to use the bathroom with his history of short bowel syndrome. Id. He was informed that medical no longer issues bathroom passes, and he would need to speak with his unit manager. Id. Plaintiff verbalized understanding. Id.

In response, Plaintiff submitted an Inmate's Request to Staff to Defendant Huner, explaining what PA Oti-Akenten had said and requesting that an exception be made and he be issued a bathroom pass. ECF 160-24. Plaintiff further states that he has "requested a bathroom pass from Medical Staff." Id. RN Savage responded to this request, stating "Brought to the CHCA [Defendant Huner's] attention – who advise you to go to sick call." Id. However, Defendant Huner testified that she did not recall this request slip, could not confirm what RN Savage wrote, and did not know if she actually told RN Savage that. Huner Dep. at 246:8–249:5.

[7] Plaintiff disputes this, stating that he purchased these popular items to trade with other incarcerated people to supplement the diet he was provided by the DOC. Plf's Additional SUMF, ¶ 78; ECF 160-2 ("Plf's Dep.") at 145:18-24. However, the Court finds that this dispute is not material.

Plaintiff also filed a grievance relating to this event, alleging unconstitutional conditions of confinement, which was denied.[8] ECF 160-25 at 5–6 (Grievance # 984428). On appeal, Defendant Sorber noted that "bathroom passes are not provided to inmates. Staff are aware that you are permitted into your cell to use the restroom. You provided no evidence of unconstitutional conditions of confinement."[9] Id. at 8. Plaintiff appealed to SOIGA. Id. at 9. Defendants Benning-Smith and Long reviewed Plaintiff's appeal and found that the medical care was appropriate. Id. at 1–2. Moreover, on July 11, 2022, Plaintiff filed an Inmate's Request to Staff to Defendant Sipple regarding a bathroom pass. ECF 160-26. In her response, Defendant Sipple stated, "[w]e do not issue bathroom passes," and officers "should" be letting Plaintiff back into his cell to use the bathroom at his request. Id. Defendant Sipple did not advise Plaintiff to request one through the disability-accommodation request process. Defendant Sipple testified that issuing "bathroom passes" was not a standard policy or procedure at SCI-Phoenix, and she did not know why Plaintiff wanted a bathroom pass, if he was ever issued a bathroom pass, or "what a bathroom pass is." Sipple Dep. at 133:6-25.

On November 22, 2022, Plaintiff had a gastroenterology consultation with Dr. Heather Gerst via telemedicine. See generally Plf's Medical Records. She noted that Plaintiff presented with reports of years of diarrhea symptoms, bloating, gas, and upper abdominal pain. Dr. Gerst also noted that Plaintiff had an EGD and colonoscopy at Temple in January 2022 and multiple

[8] Plaintiff also filed grievances in August 2022, October 2022, and August 2023 regarding instances where he alleged that staff did not let him back into his cell to use the bathroom. See ECF 160-27 (Grievance # 993577); ECF 160-28 (Grievance # 1046957); ECF 160-30 (Grievance # 1062616). Plaintiff alleges that as a result, he soiled himself on several occasions, missed recreation time, or chose to not go to the yard or dayroom. See ECF 160-11.

[9] Defendant Sorber testified that in response to Plaintiff asking for a bathroom pass, he thought that "There is no bathroom pass. There is none. If you must use the restroom, you have to use the restroom. That goes for anybody. Why should anybody have any special treatment." Sorber Dep. at 166:8–167:17. He further testified that "if he is a grown man and he needs to go to the bathroom, he goes to the bathroom. There is no reason for a pass to do that." Id.

previous colon and small bowel surgeries. Dr. Gerst stated that Plaintiff's GI and surgery records needed to be obtained to make recommendations. She further noted that he may have SIBO (Small intestinal bacterial overgrowth) and/or short gut syndrome based on remainder of bowel left.

On December 8, 2022, a consult request was entered for a follow-up with Dr. Gerst. Plf's Medical Records at 349. On December 30, 2022, Defendant Letizio discontinued the request, noting a mistaken entry. Id. That same day, Defendant Letizio entered a consult request for a follow-up visit with Dr. Gerst. Id. at 346. The appointment was scheduled for February 7, 2023.

**4. Plaintiff's February 2023 GI Follow-Up**

Plaintiff was also seen at sick call twice in January 2023 for GI complaints, including pain, stomach gurgling, bloody stools, gas, and bloating. See generally Plf's Medical Records. At one of the appointments, Defendant Walsh noted that Plaintiff walked normally, was able to sit without frequently changing positions, and appeared to be in no distress or pain. Id. at 33. Plaintiff was given medication for gas and bloating. See generally Plf's Medical Records.

On February 7, 2023, Plaintiff had a telemedicine visit with Dr. Gerst. See generally id. Plaintiff reported gas, bloating, abdominal pain, and diarrhea. Dr. Gerst noted that she reviewed his records, including the pathology report and summary from the EGD and colonoscopy at Temple in January 2022. As a result, she noted that he should be on a PPI (proton pump inhibitor) daily and have repeat surveillance via EGD in three years. She further recommended a trial of antibiotics to see if he has SIBO due to his history of prior small bowel resections. The plan was to schedule an EGD with colonoscopy and to obtain new colon biopsies to rule out irritable bowel disease and to look for any source of nausea on EGD, and to follow-up to review the results.

On February 15, 2023, a consult request was entered for Plaintiff to undergo the EGD and colonoscopy. Plf's Medical Records at 342. The appointment was scheduled for June 8, 2023.

### 5. Plaintiff's June 2023 Colonoscopy

Plaintiff was seen several times at sick call between February 2023 and June 2023 for complaints of GI symptoms, including stomach spasms, diarrhea, blood in his stool, and difficulty digesting the food. See generally Plf's Medical Records. Plaintiff was given medication and orders were placed for lab work and to monitor Plaintiff's weight. See id. Providers also requested that Plaintiff provide three hemoccult cards, which are diagnostic paper slide tests used to detect hidden blood in stool samples. Id. at 18. Providers explained to Plaintiff how to complete the hemoccult cards to which he responded, "I'm not going to do that[,] that's not sanitary." Id.

On June 5, 2023, Plaintiff reported to the infirmary to complete the colonoscopy prep, which includes flushing out the intestines and requires frequent use of the toilet. See generally Plf's Medical Records. When he arrived, staff instructed him to enter a cell with three other men and one toilet. Plaintiff explained that he had a disability accommodation for a single cell and would not be able to prepare for the colonoscopy in that cell. Staff did not honor Plaintiff's single cell,[10] and Plaintiff alleges he informed an officer of his single cell accommodation, and that officer responded, using profanity, that Plaintiff's Z-code did not matter in the infirmary and refused to contact a higher-ranking officer when asked. Plf's SUMF, ¶ 125. Providers noted that Plaintiff refused to stay in the infirmary and undergo the colonoscopy prep procedure. See generally Plf's Medical Records. Accordingly, the colonoscopy was rescheduled for October 16, 2023. Plaintiff filed a grievance about this incident. See Plf's Grievances at 79–88 (Grievance # 1037617).

[10] Defendant Huner later testified that denying Plaintiff the single cell while he was in the infirmary violated the ADA. Plf's SUMF, ¶ 126; Huner Dep. at 201:14-21.

Between February 2023 and October 2023, Plaintiff also continued to file grievances, alleging that he was not getting the medical care he needed at SCI-Phoenix. See, e.g., id. at 63–70 (Grievance # 1020021), 71–78 (Grievance # 1023296), 95–104 (Grievance # 1053015). Defendant Terra, BHCS, and SOIGA upheld these grievances, stating that the medical care was reasonable and appropriate. See id.

### 6. Plaintiff's October 2023 Colonoscopy

Between June 2023 and October 2023, Plaintiff was seen several times in sick call. See generally Plf's Medical Records. In at least one visit, Defendant Walsh alleges Plaintiff was repeatedly rude, obnoxious, demanding, and immediately confrontational. Id. at 4–6. He alleges Plaintiff was verbally agitated, hostile, and would repeatedly interject when Defendant Walsh attempted to provide information to Plaintiff. Id. Accordingly, Defendant Walsh alleges he requested a correctional officer be present in the room. Id. In at least one visit, the officer had to escort Plaintiff back to the waiting room until the situation was deescalated. Id.

On October 13, 2023, Plaintiff reported to the infirmary to undergo the prep for his colonoscopy. See generally Plf's Medical Records. Plaintiff was given a single cell in the infirmary. Prior to the rescheduled colonoscopy, Defendant Huner sent an email about Plaintiff to several staff members, stating "This inmate has an ADA for a single cell, this is more than just a Z code. He MUST be provided a single cell when in the INF and at all times in jail. … Please ensure all staff know he must be given a single cell in the INF. He has an active lawsuit against me for this, communicate to all so this is not an issue as it was in June." ECF 160-37.

On October 16, 2023, Plaintiff was transported to Einstein Medical Center, where he underwent a colonoscopy and upper endoscopy. See generally Plf's Medical Records. The procedures revealed: (1) perianal and digital rectal examinations were normal; (2) the colon (entire

examined portion) was mildly tortuous; (3) normal mucosa was found in the entire colon; (4) esophageal mucosal changes consistent with short segment Barrett's esophagus present at the gastroesophageal junction; (2) diffuse mildly erythematous mucosa without bleeding in the stomach; and (3) normal exam of duodenum. It was recommended that he resume his normal diet, continue present medications, await pathology results, return for a follow-up visit, and repeat colonoscopy in five years. Id. Following this, providers at SCI-Phoenix reviewed the results.

### 7. Plaintiff's Bathroom Pass Approval

On October 18, 2023, Plaintiff submitted an Inmate Disability Accommodation Request Form explicitly asking for a bathroom pass. Commonwealth Defs.' SUMF, ¶ 14. On November 20, 2023, Defendant Huner issued Plaintiff a "bathroom pass." ECF 160-29. Defendant Huner sent an email with a photo of the pass, explained what it meant, and asked staff members to "pass this info on to officer [sic] that may encounter this pass so they are aware we must legally provide him this access." Id. The pass said, "Inmate is permitted to use toilet/bathroom at his request." Id. A revised bathroom pass was issued on December 11, 2023, and specifically states "Inmate shall return to his out-of-cell activities after toilet use." ECF 160-39.

However, Plaintiff alleges that even once he was issued the bathroom pass, there were instances in November 2023, December 2023, January 2024, February 2024, September 2024, and May 2025 where staff did not honor his bathroom pass. Plf's SUMF, ¶¶ 211, 214–38. Plaintiff filed grievances in response to these instances. See generally Plf's Grievances. Plaintiff alleges he spoke with Defendant Huner about this issue two or three times, although Defendant Huner testified that she had no knowledge of staff not honoring the bathroom pass. Plf's SUMF, ¶ 212; Huner Dep. at 252:18-23.

**8. Plaintiff's March 2024 GI Follow-Up**

Plaintiff was seen in sick call several times between October 2023 and March 2024 for his GI symptoms. See generally Plf's Medical Records. Medications, lab work, and stool samples were ordered. Id.

For example, on November 7, 2023, Defendant Walsh saw Plaintiff at sick call for his complaints of stomach spasms, causing pain and vomiting. Id. at 450–52. Defendant Walsh insisted that a correctional officer be present during the visit due to his past interactions with Plaintiff. Id. Defendant Walsh asked Plaintiff to narrow the focus of the visit, as he listed about ten different GI complaints on his sick call slip, and Plaintiff said he wished to focus on the abdominal spasms. Id. However, when Plaintiff asked Defendant Walsh why there was so much tension between them, Defendant Walsh, said, "well, for starters, you're trying to sue me." Id. According to Defendant Walsh, Plaintiff appeared to be comfortable during the visit and Plaintiff's conditions were chronic in nature. Id. Defendant Walsh told Plaintiff he will "continue to have" abdominal spasms and that "[o]ur goal is not to free [Plaintiff] from all abdominal pain." Id. Plaintiff also filed a grievance regarding this incident. Plf's Grievances at 105–14 (Grievance # 1060309). Defendant Huner's response was that the care was "reasonable and appropriate," see id., although she later testified "[i]f I see something or hear something that's inappropriate with the providers, then yes, I would let their supervisor know" but Wellpath would address their employee's behaviors and it was not her responsibility. Huner Dep. at 224:1-3, 225:10-16.

On January 2, 2024, Defendant Letizio entered an order for Plaintiff for a high protein, low carbohydrate diet, stating that the order was "PER GI AND COURT JUDGE." Plf's Medical Records at 496–97. Defendant Letizio also entered a consult request on January 3, 2024, for a gastroenterology follow up, writing that Plaintiff was "CURRENTLY INVOLVED IN

LITIGATION AND WORKING CLOSELY WITH WELLPATH ATTORNEY." Id. at 507. This appointment was scheduled for March 4, 2024.

On March 4, 2024, Plaintiff had an outside gastroenterology visit at Temple with CRNP Alexandra Thurston. See generally Plf's Medical Records. Following an exam, CRNP Thurston ordered new lab work and medications, and Plaintiff was instructed to follow up in three months. On March 5, 2024, an NP entered a consultation request for a follow-up, which Defendant Letizio discontinued on March 7, 2024, as a mistaken entry. Id. at 576. Defendant Letizio then entered a consult request for a follow-up, noting Plaintiff had "FREQUENT VISITS TO THE MEDICAL DEPARTMENT AND COMPLETE MANIPULATION," and "NOW HAS AN ATTORNEY AND I HAVE DISCUSSED THIS CASE WITH WELLPATHS ATTORNEY ON A RATHER FREQUENT BASIS LATELY." Id. at 572–73. It was scheduled for June 5, 2025.

Plaintiff alleges that he continued to inquire about the status of his follow-up no less than 10 times over the next year through written requests to staff, sick call visits, and grievances. See generally Plf's Medical Records; Plf's Grievances; see also ECF 167-3.

**9. Plaintiff's April 2024 Infirmary Visit**

In March 2024, following Plaintiff's gastroenterology appointment, he was to start a trial of Xifaxan, an antibiotic. See generally Plf's Medical Records. An NP ordered the medication to be KOP, but Defendant Letizio changed it to DOT. However, Plaintiff was not informed that he would need to report to medical to receive each dose. Defendant Letizio testified that his insistence on making it DOT was to ensure that Plaintiff was taking the medication because if his symptoms

improved with it, it was that. Letizio Dep. at 230:2-22. He further testified that the medicine was expensive, and he was concerned that Plaintiff would not take the medication if it was KOP. Id.[11]

On March 12, 2024, Plaintiff was informed that the medication was DOT. In response, Plaintiff alleges he explained to staff that coming to medical and standing in line three times a day was not practical, since he needed to remain close to a toilet. The staff member allegedly told Plaintiff that he should submit a sick call slip requesting to have the medication changed to KOP. When Defendant Letizio was informed that Plaintiff had not had one dose of Xifaxan yet and was concerned about standing in the medication line, he insisted the medication be kept as DOT, writing that if "[h]e wants to use the excuse of his condition so be it," "nobody is to change it to KOP for any reason" and "[t]his medication is to be DOT PERIOD." ECF 167-14 ("Plf's Exhibit 53"); ECF 167-15 ("Plf's Exhibit 54"); ECF 167-16 ("Plf's Exhibit 55").

After Plaintiff did not report to medical to get the Xifaxan and had been told to submit a sick call slip, Defendant Letizio wrote "That's because he is playing a game with him and his attorney. He can keep playing it. Only makes him look terrible and the DOC and Wellpath look great." Plf's Exhibit 55. Defendant Letizio also wrote that "HE CAN MAKE THE CHOICE TO COME UP [THREE TIMES A DAY] TO GET THIS MEDICATION. IT IS HIS CHOICE. HE CAN CONVINCE A JURY THAT HE CANNOT MAKE IT UP HERE [THREE TIMES A DAY] DUE TO HIS CONDITION WHICH IS TOTALLY FALSE." ECF 167-17 ("Plf's Exhibit 56"). Plaintiff also filed a grievance relating to this incident. See Plf's Grievances at 124–33 (Grievance # 1078659).

[11] Plaintiff disputes this, stating that this was in retaliation for him filing grievances. See Plf's Additional SUMF, ¶¶ 294–311, 316–17. Plaintiff also alleges Defendant Letizio retaliated against him in March 2024 and February 2025 he denied him Ensure and overruled the gastroenterologist's order, stating that Plaintiff was "overweight." See id., ¶¶ 318–28; Plf's Medical Records at 479, 607, 610; ECF 167-19.

On April 4, 2024,[12] Defendant Letizio noted that Plaintiff placed a sick call, stating he had uncontrollable diarrhea for the past six days with blood and undigested food in it, pain from stomach spasms, and feeling dehydrated. Plf's Medical Records at 685–86. Defendant Letizio alleges he told Plaintiff that, given his current state of health as described in his sick call slip, he would need to be monitored in the infirmary and may need lab work and IV fluids, which Plaintiff refused. Id. Defendant Letizio further explained that he needed to see the blood and undigested food when Plaintiff had a bowel movement and asked Plaintiff not to flush the toilet until staff viewed this. Id. Nursing also planned to document what Plaintiff consumed on his meal tray. Defendant Letizio noted that he would attempt to see him daily and future treatments would be dictated by his clinical course. Plaintiff insisted on needing to speak to his attorney and stated that he would defecate on the floor if this was to occur because the providers "were treating him like an animal." Id. He also informed the infirmary officer that he was going to get Defendant Letizio fired or run him out of the prison like he did to Defendant Walsh (who recently retired). Id.

Plaintiff had to be escorted to the infirmary by correctional officers, where he was monitored from April 4, 2024, to April 8, 2024. See generally Plf's Medical Records. On April 8, 2024, Plaintiff was discharged. Defendant Letizio noted that Plaintiff did very well in the infirmary, as he had no further episodes of blood or undigested food in his bowel movements, ate almost all his meals, and did not appear to be in discomfort. Id. at 661. Defendant Letizio also

[12] What exactly occurred on April 4, 2024, is disputed. Plaintiff alleges that Defendant Letizio "grabb[ed]" him, going "at him in a way that immediately escalated [the situation]." Plf's Additional SUMF, ¶¶ 333–42. Plaintiff further alleges Defendant Letizio's voice was raised, and his was not. Id. Plaintiff also alleges that Defendant Letizio wrote that he wanted to use this infirmary stay to gather "DOCUMENTATION [to be] USED IN COURT," and that Defendant Letizio told Plaintiff that he was "irritated" with him, he was not worried about lawsuits because he has "tons of lawsuits" against him and most get dismissed, and that Plaintiff was not as smart as he thinks he is. Id. Defendant Letizio alleges that Plaintiff "made such a scene" that correctional officers needed to escort him. Plf's Medical Records at 685–86. Defendant Letizio also wrote in an email that "NOBODY DISCHARGES HIM EXCEPT ME WHENEVER THAT TIME COMES." ECF 167-22 ("Plf's Exhibit 61").

noted that medical was still awaiting receipt of a list of his commissary purchases, so that they could advise him against any items which might be problematic to his dietary needs.

### 10. Plaintiff's June 2025 GI Follow-Up

Between May 2024 and June 2025, Plaintiff was regularly seen at sick call for his GI complaints. See generally Plf's Medical Records. Plaintiff's medications were renewed and lab work was obtained. Id. Providers' notes indicated that Plaintiff was not hunched over with abdominal pain and walked with a strong and steady gait. Id. at 579, 594, 597, 606, 616. However, in at least one instance, Plaintiff became frustrated and talked over the provider, and the exam was unable to be completed. See id. at 616–17. Plaintiff also continued to file grievances about his medical care, which were denied as the care was "reasonable and appropriate" and Plaintiff's "medical needs were being met." See, e.g., Plf's Grievances at 151–58 (Grievance # 1093411), 174–79 (Grievance # 1124710), 180–88 (Grievance # 1128954).

Plaintiff also repeatedly told staff members that the diet was making his symptoms worse. For instance, on June 26, 2024, Defendant Bora Saika saw Plaintiff at sick call where he requested to be taken off the high protein, low carbohydrate diet, as he had not been receiving the menu items, and SCI-Phoenix staff have "weaponized food against me for filing a lawsuit and grievances and I don't process or digest beans, but they are giving me 3x/daily." Plf's Medical Records at 648–50. Defendant Bora Saika reviewed the therapeutic diet ordered in January of 2024 along with the state dietician's evaluation, and the plan was to continue as ordered. Plaintiff also filed a grievance regarding this incident. See Plf's Grievances at 159–66 (Grievance # 1095314).

On September 4, 2024, Defendant Letizio saw Plaintiff to discuss items that were taken from him by security when he was transported to the Restricted Housing Unit (RHU). Plf's Medical Records at 636–38. Plaintiff reported having no idea why he was placed in the infirmary,

but was filing paperwork to obtain a back brace, bed wedge, and cane. Id. Defendant Letizio noted Plaintiff has GERD and would benefit from the bed wedge, as well as subjective low back pain, so he would be given a new back brace. Id. However, Defendant Letizio noted that there was no reason why Plaintiff would need a cane, as Plaintiff had been observed on multiple occasions walking without a cane for years at SCI-Phoenix, walked without any observable deficits, and had never been found on the ground due to his knee giving out. Id. Defendant Letizio further noted safety concerns with allowing inmates to have items like canes if they are not needed. Id. Plaintiff noted that he would be filing a grievance about this.

On October 2, 2024, Plaintiff was transported to Temple for a GI appointment and later returned to SCI-Phoenix. Plf's Medical Records at 626–29. Plaintiff reported that he was not seen at Temple, as there was an issue with Temple's scheduling of the appointment. See Plf's Grievances at 167–73 (Grievance # 1111485).

On June 5, 2025, Plaintiff had a gastroenterology consult at Temple Health with Dr. Mayada Ismail. See generally Plf's Medical Records. Dr. Ismail was not provided with all of Plaintiff's background information. After an exam, Dr. Ismail noted that Plaintiff's symptoms had been variable over time and pathology from his 2022 scope showed chronic inflammation. She also noted that because Plaintiff reported that he did not respond to Xifaxan, SIBO seemed less likely, but she could not conclude a diagnosis of short bowel syndrome without additional records. She noted that there was a possibility of underlying inflammatory bowel disease based upon the previous pathology findings. She further noted that his symptoms could be multifactorial, considering his history of multiple surgeries, which may contribute to malabsorption, adhesions causing pain, and potentially functional issues. The plan was to check basic labs, check

inflammatory markers, obtain a CT scan of the abdomen, obtain an EGD and colonoscopy with repeat biopsies of the small bowel and colon, and start fiber supplements to bulk stool.

On June 11, 2025, Dr. Michael Schettino entered a consult request for Plaintiff to be scheduled for a CT of his abdomen and pelvis at Temple GI Clinic. Plf's Medical Records at 561. Dr. Schettino also placed a consult request for Plaintiff to have a gastroenterology follow-up in three months. Id. at 563.

Plaintiff was released from custody on July 8, 2025.

## III. PROCEDURAL HISTORY

As relevant here, on February 20, 2024, Plaintiff filed a Second Amended Complaint against Defendants DOC, Wellpath LLC, Benning-Smith, Long, Sorber, Supple, Huner, LeClerc, Letizio, Bora Saika, and Walsh. ECF 81. On August 26, 2025, Plaintiff filed a Supplemental Complaint, alleging Defendants continued to deny and delay his necessary medical care and accommodations, causing additional harm and suffering. ECF 132.

In his Second Amended Complaint and Supplemental Complaint, Plaintiff raises the following claims:

1. Count I: 42 U.S.C. § 1983 – Eighth Amendment – Cruel and Unusual Punishment as to Defendants Benning-Smith, Long, Sorber, Terra, Sipple, Huner, LeClerc, Letizio, Bora Saikia, and Walsh;
2. Count II: 42 U.S.C. § 1983 – Eighth Amendment – Supervisory Liability as to Defendants Benning-Smith and Long;
3. Count IV: 42 U.S.C. § 1983 – First Amendment Retaliation as to Defendant Walsh;
4. Count V: Title II of the ADA, 42 U.S.C. § 12132, as to Defendants DOC, Benning-Smith, Long, Terra, and Sipple, in their official capacities;

5. Count VI: Section 504 of the RA, 29 U.S.C. § 794 as to Defendant DOC
6. Count VII: Professional Negligence and Vicarious Liability under Pennsylvania Law as to Defendants Long, LeClerc, Letizio, and Bora Saikia
7. Count IX: 42 U.S.C. § 1983 – First Amendment Retaliation as to Defendant Letizio

ECF 81; ECF 132.[13]

Following discovery, all Parties moved for summary judgment on some or all of Plaintiff's claims:

1. Commonwealth Defendants' Motion for Summary Judgment (ECF 155)
2. Medical Defendants' Motion for Summary Judgment (ECF 157)
3. Plaintiff's Motion for Partial Summary Judgment (ECF 159)[14]

This case is now ripe for resolution.

## IV. LEGAL STANDARD – SUMMARY JUDGMENT

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict

[13] Count III and Count VIII against Wellpath LLC were dismissed with prejudice on December 9, 2025, because of Wellpath's discharge in bankruptcy. See ECF 149. Likewise, Wellpath LLC was dismissed from Count VII.

Defendant LeClerc passed away on December 26, 2025, and his estate has not yet been named or substituted as a defendant. See ECF 163. However, as noted below, Plaintiff does not oppose the granting of summary judgment in favor of Defendants LeClerc and Bora Saikia.

[14] Plaintiff also filed a surreply brief at ECF 178. However, surreply briefs are not permitted without leave from the Court. See Judge Baylson's Pretrial and Trial Procedures – Civil Cases, Section C.2 ("Surreply briefs are not accepted without leave of the Court and should only be requested if the moving party has asserted new arguments or citations in its reply brief."), available at: https://www.paed.uscourts.gov/sites/paed/files/documents/procedures/baypol.pdf. Plaintiff did not file a motion with the Court asking for leave to file a surreply brief. Therefore, the Court finds that the surreply brief at ECF 178 is improperly filed and will not consider Plaintiff's arguments in the surreply brief in deciding the instant Motions.

for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" if it might affect the outcome of the case under governing law. Id.

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." Id. at 325. After the moving party has met its initial burden, the adverse party's response must, by "citing to particular parts of materials in the record," show that a fact is "genuinely disputed." Fed. R. Civ. P. 56(c)(1). Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the opposing party. Anderson, 477 U.S. at 255.

## V. EIGHTH AMENDMENT CLAIMS

In Counts I and II, Plaintiff brings claims under § 1983 for violations of the Eighth Amendment against Defendants Benning-Smith, Long, Sorber, Terra, Sipple, Huner, LeClerc, Letizio, Bora Saikia, and Walsh. See ECF 81 at 53. Plaintiff alleges Defendants Benning-Smith, Long, Sorber, Terra, Sipple, Huner, LeClerc, Letizio, Bora Saikia, and Walsh were deliberately indifferent to his serious medical needs while incarcerated, and that as supervisors, Defendants Benning-Smith and Long established and implemented practices and customs that caused his harm. Id. As Plaintiff's claims relate to his time in prison at SCI-Phoenix while serving a criminal

sentence, his claims arise under the Eighth Amendment, not the Fourteenth Amendment. See Natale v. Camden Cnty. Corr. Facility, 318 F.3d 575, 581 (3d Cir. 2003).

**A. Count I: 42 U.S.C. § 1983 – Eighth Amendment – Cruel and Unusual Punishment**

As a general matter, failure to provide adequate medical treatment violates the Eighth Amendment only when it results from "deliberate indifference to a prisoner's serious illness or injury." Estelle v. Gamble, 429 U.S. 97, 105 (1976). To state a cognizable Eighth Amendment claim under § 1983, Plaintiff must allege "(i) a serious medical need, and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need." Natale, 318 F.3d at 582; see also Brown v. Chambersburg, 903 F.2d 274, 278 (3d Cir. 1990) (a doctor exercising professional judgment does not violate a prisoner's constitutional rights). A medical need is serious if it is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." Woloszyn v. County of Lawrence, 396 F.3d 314, 320 (3d Cir. 2005) (citation omitted).[15]

Determining whether someone acted with deliberate indifference is a subjective inquiry and acting with deliberate indifference means the actor consciously disregarded a serious risk to the plaintiff's health or safety. See Natale, 318 F.3d at 582. To be found liable for deliberate indifference, an official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994). "Deliberate indifference requires more than negligence or medical malpractice." Charleston v. Corizon Health, Inc., No. CV 17-3039, 2018 WL 1757606,

[15] Commonwealth Defendants do not dispute that Plaintiff's short-bowel syndrome qualifies as a serious medical need. See ECF 155-2 at 4 n.1. Medical Defendants also do not specifically dispute this fact either. See generally ECF 157-2.

at *11 (E.D. Pa. Apr. 12, 2018) (Kearney, J.) (citing Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999)). A "'mere disagreement as to the proper medical treatment' … does not 'support a claim of an [E]ighth [A]mendment violation.'" Pearson v. Prison Health Serv., 850 F.3d 526, 543 (3d Cir. 2017) (citation omitted). Plaintiff does not need to demonstrate "acts or omissions for the very purpose of causing harm or with knowledge that harm will result." Farmer, 511 U.S. at 835. Nevertheless, "prison officials are afforded considerable latitude in the diagnosis and treatment of prisoners." Palakovic v. Wetzel, 854 F.3d 209, 227 (3d Cir. 2017) (citation omitted). Thus, "[w]here a prisoner has received some amount of medical treatment, it is difficult to establish deliberate indifference[.]" Id.

The Third Circuit has found deliberate indifference "where (1) prison authorities deny reasonable requests for medical treatment, (2) knowledge of the need for medical care is accompanied by the intentional refusal to provide it, (3) necessary medical treatment is delayed for non-medical reasons, and (4) prison authorities prevent an inmate from receiving recommended treatment for serious medical needs." Pearson, 850 F.3d at 538. In general, where a plaintiff complains of "inadequate medical care," the Third Circuit has found deliberate indifference "in situations where there was 'objective evidence that [a] plaintiff had serious need for medical care,' and prison officials ignored that evidence." Natale, 318 F.3d at 582 (citation omitted).

However, non-medical prison officials are normally entitled to defer to the judgment of medical professionals. Spruill v. Gillis, 372 F.3d 218, 236 (3d Cir. 2004); Durmer v. O'Carroll, 991 F.2d 64, 69 (3d Cir. 1993); Thomas v. Dragovich, 142 F. App'x 33, 37 (3d Cir. 2005) (nonprecedential). For non-medical prison officials to be held liable under § 1983, the plaintiff must establish actual or constructive knowledge that the prison doctors mistreated or failed to treat a prisoner. Spruill, 372 F.3d at 236.

### 1. **Defendant Benning-Smith**

a. Defendant's Contentions

Defendant Benning-Smith argues that she is not a medical professional, and therefore does not make clinical decisions, cannot provide medical opinions, and does not make determinations if care is adequate. ECF 155-2 ("Commonwealth Defs.' Mot."), at 6–9, 11–13. Any "final decision in clinical matters" is made by the chief of clinical services. Id. at 12. Her role is administrative, merely reviewing to confirm that the grievance forms are completed. Id. Thus, she argues she had no control or involvement in medical decisions generally or over the Wellpath medical personnel at SCI-Phoenix. Id. at 6–9, 11–13.

Defendant Benning-Smith further contends that she was "justified in believing that the prisoner [was] in capable hands" when under the care of medical staff and entitled to defer to the judgment of medical professionals. Id. at 7–9 (citing Spruill, 372 F.3d at 236). She argues she is not liable because she did not have contemporaneous knowledge of and acquiesced in the allegedly inadequate medical care of Plaintiff. Id. at 9. Specifically, she did not know of Plaintiff's specific complaints and condition, thereby contradicting Plaintiff's position that she had "reason to believe that [Plaintiff]'s medical needs were not being met." ECF 171 ("Commonwealth Defs.' Reply") at 6. For example, Defendant Benning-Smith testified that she did not know anything about the request from the specialist that Plaintiff saw in March 2024 that Plaintiff should return for a follow-up visit or Plaintiff's request for a single cell. Id. at 6–8 (citing Benning-Smith Dep. at 163:4-10, 173:1-6, 179:3-16). Moreover, Defendant Benning-Smith explained that no DOC employee has the power to decide whether an inmate receives specialist care and only the site medical director (here, Defendant Letizio) could determine the order in which patients receive offsite treatment. Commonwealth Defs.' Mot. at 12.

Although Plaintiff filed request slips and grievances complaining about the quality of care, Defendant Benning-Smith argues she is not responsible because a prison official who fails to respond to an inmate complaint regarding medical treatment is not deliberately indifferent as a matter of law when the prisoner was under the care of a doctor. Id. at 8, 8 n.2 (citing McCluskey v. Vincent, 505 F. App'x 199, 203–04 (3d Cir. 2012) (nonprecedential); Paluch v. Sec'y, Pa. Dept. of Corr., 442 F. App'x 690, 695 (3d Cir. 2011) (nonprecedential)).

On reply, Defendant Benning-Smith emphasizes that Plaintiff did not suffer any harm in waiting to see a specialist and was constantly monitored by medical staff. Commonwealth Defs.' Reply at 1–2. She argues Plaintiff distorts the record, cherry-picks phrases, fails to include key facts, and misleads the Court. Id. at 14. Defendant Benning-Smith argues that when the evidence is viewed in full, Plaintiff cannot establish "acts or omissions" by prison officials that indicate deliberate indifference to a serious medical need. Id.

b. Plaintiff's Contentions

In opposition, Plaintiff argues that because the DOC has a nondelegable duty to provide adequate medical care to inmates, DOC officials have "constitutional supervisory duties" that they cannot "abdicate" by "hiring a private contractor to provide" medical care and can face liability when they have sufficient knowledge and personal involvement. ECF 168 ("Plf's Opp.") at 16–17 (citing Estelle, 429 U.S. at 103; West v. Atkins, 487 U.S. 42, 56 (1988); Barkes v. First Corr. Med., Inc., 766 F.3d 307, 326–27 (3d Cir. 2014), rev'd on other grounds, Taylor v. Barkes, 135 S. Ct. 2042 (2015)). Plaintiff contends that a reasonable jury could find that Defendant Benning-Smith was deliberately indifferent to his medical needs, as she failed to take reasonable measures to address them and had an active role in reviewing and responding to Plaintiff's grievances (as is the law of the case). Id. at 17–18 (citing ECF 35 ("Mot. to Dismiss Mem.") at 7–9; Farina v.

Nokia, Inc., 625 F.3d 97, 117 n.21 (3d Cir. 2010); Sutton v. Rasheed, 323 F.3d 236, 249–50 (3d Cir. 2003); Atkinson v. Taylor, 316 F.3d 257, 271 (3d Cir. 2003)).

Plaintiff argues Defendant Benning-Smith was on notice that he was not receiving adequate medical care but failed to address it. Id. at 5–6, 18–20 (citing Spruill, 372 F.3d at 236; Barkes, 766 F.3d at 327; Bell v. Lindsay, 264 F. Supp. 3d 684, 689 (E.D. Pa. 2017) (Rufe, J.)). Plaintiff argues that prison officials are "generally … justified in believing" doctors are providing adequate care, but when presented with evidence to the contrary, they must investigate and, if appropriate, intervene. Id. at 19 (citing Spruill, 372 F.3d at 236). Plaintiff contends that when, as here, the inadequacies stem not only from treatment decisions but from administrative hurdles and the conduct of medical staff, any deference medical providers are owed falls away. Id. Plaintiff contends that Defendant Benning-Smith reviewed at least a dozen grievance appeals regarding his need for medical care (and that she reads the initial grievance as well as the subsequent appeals). Id. at 20 (citing Plf's Additional SUMF, ¶¶ 11, 20, 107–08, 118, 149–50, 160, 193–94, 201–03). Plaintiff argues that she was repeatedly given reason to believe that his medical needs were not met but failed to inquire into his concerns, discuss the matter with providers, or raise concerns with administrators at SCI-Phoenix. Id. (citing Plf's Responses to Commonwealth Defs.' SUMF, ¶¶ 23–24; Plf's Additional SUMF, ¶¶ 108–09, 151, 196, 203–05).

Plaintiff next contends that Defendant Benning-Smith was aware of his medical condition and need for access to a toilet but failed to promptly provide him with such accommodations, thus violating the Eighth Amendment through inaction constituting deliberate indifference. Id. at 25–26 (citing Mot. to Dismiss Mem. at 8–9). Plaintiff argues these were not matters of medical judgment requiring deference to medical providers but rather matters of prison administration, and her role in denying him a single cell and bathroom pass provide a basis for Eighth Amendment

liability. Id. (citing Young v. Quinlan, 960 F.2d 351, 365 (3d Cir. 1992) (denial of basic sanitation violates the Eighth Amendment); Farina, 625 F.3d at 117 n.21 (explaining law of the case)). Plaintiff argues Defendant Benning-Smith upheld the denial of his request for a bathroom pass, despite it being within her power as the director of the bureau responsible for disability accommodations. Id. at 28–29. Plaintiff contends he received a bathroom pass about a year and a half after he first began requesting one, and only after counsel intervened. Id. at 29.

c. Analysis

Here, Defendant Benning-Smith, as the BHCS Director, is not a medical professional and was thus entitled to defer to the judgment of medical professionals. Spruill, 372 F.3d at 236; Durmer, 991 F.2d at 69. Plaintiff alleges, but does not demonstrate, that Defendant Benning-Smith had actual or constructive knowledge of his medical needs and that the medical providers mistreated or failed to treat him. Spruill, 372 F.3d at 236. Defendant Benning-Smith testified that she was not aware of (1) Plaintiff's specific medical condition or the details of his nonstandard diet, (2) that he had been taken to the emergency room twice while at SCI-Phoenix, (3) that the specialist Plaintiff saw in March 2024 indicated that he should return for a follow up visit, and (4) Plaintiff's request for a single cell. See Benning-Smith Dep. at 108:5-23, 163:4-10, 173:1-6, 179:3-16. She further testified that she did not know if Plaintiff's request for a consultation with a GI specialist had been scheduled, and that she found out about the "bathroom pass" in preparation for the lawsuit, but she did not know if he was ever issued one. Id. at 143:1-8, 180:6-18, 188:4-7.

Moreover, failure to respond to an inmate complaint regarding medical treatment is not deliberate indifference when the prisoner was under the care of a doctor. Davis v. Prison Health Servs., Inc., 558 F. App'x 145, 149–50 (3d Cir. 2014) (nonprecedential); Paluch, 442 F. App'x at 695. The record establishes that Plaintiff was under the care of medical staff at SCI-Phoenix and

received some form of treatment at sick call nearly every day. See generally Plf's Medical Records. Accordingly, Plaintiff cannot demonstrate that Defendant Benning-Smith was deliberately indifferent to his medical needs.

Therefore, summary judgment is **GRANTED** as to Defendant Benning-Smith on Count I.

**2. Defendant Long**

a. Defendant's Contentions

Defendant Long argues that although he is a medical doctor, there is insufficient evidence to establish that he acted with deliberate indifference to Plaintiff's needs. Commonwealth Defs.' Mot. at 14–15. According to the grievance review process, Quality Improvement ("QI") nurses review the record, then Defendant Long meets with them, discusses the grievance, and comes to a determination. Id. at 14; see also Benning-Smith Dep. at 67:11-17. Here, Defendant Long testified that, with QI nurses, he reviewed Plaintiff's medical records and determined that the care was reasonable and appropriate. Commonwealth Defs.' Mot. at 14 (citing Long Dep. at 155:4-19, 164:11-23, 183:24–184:8, 216:6-15). Defendant Long contends there is nothing in the record calling that process into doubt or suggesting he did not follow it with respect to Plaintiff. Id. Accordingly, he contends he could not have had a "culpable state of mind" if he genuinely believed in his professional opinion that Plaintiff's care was adequate. Id. at 14–15 (citing Rouse, 182 F.3d at 197; Estelle, 429 U.S. at 103). Defendant Long argues Plaintiff's subjective disagreement with a medical professional's treatment does not constitute a constitutional claim when Plaintiff was receiving treatment. Id. at 15 (citing Spruill, 372 F.3d at 235; Coudriet v. Vardaro, 545 F. App'x 99, 104 (3d Cir. 2013) (nonprecedential)).

Defendant Long further argues that Plaintiff's thesis that he "knew [Plaintiff] needed specialist care" is misplaced, as his testimony was the opposite: seeing a specialist was of no real

benefit to Plaintiff and there was not much a gastroenterologist could do. Commonwealth Defs.' Reply at 13 (citing Long Dep. at 134:11–136:1). Defendant Long was also aware that Plaintiff's overall health remained good, as Plaintiff's diet was monitored, his BMI remained healthy, and lab work was performed and found no issues. Id. Accordingly, he argues that his decisions that "the medical care provided was reasonable and appropriate" was the correct conclusion. Id.

b. Plaintiff's Contentions

In opposition, Plaintiff contends that a jury could find that Defendant Long knew Plaintiff was not receiving adequate care but said it was "reasonable and appropriate." Plf's Opp. at 24–25. Plaintiff argues a jury can rely on other evidence, including Plaintiff's expert report, to conclude that Defendant Long was deliberately indifferent (and Defendant Long does not provide an expert report of his own to rebut Plaintiff's). Id. at 24, 24 n.7. Plaintiff further argues Defendant Long's role in providing oversight and his insistence, despite evidence to the contrary, that the care was "reasonable and appropriate," demonstrates deliberate indifference. Id. at 24–25. Moreover, Plaintiff contends that Defendant Long's own testimony demonstrates that he knew Plaintiff needed specialist care but did not receive it and ignored Plaintiff's requests for specialist care in his grievances. Id. at 25. Plaintiff then argues that whether Defendant Long was deliberately different is a question for the factfinder. Id.

Plaintiff next contends that Defendant Long was aware of his condition and need for access to a toilet but failed to promptly provide him with such accommodations, thus violating the Eighth Amendment through inaction constituting deliberate indifference. Id. at 25–26 (citing Mot. to Dismiss Mem. at 8–9). Plaintiff argues Defendant Long did nothing to accommodate his need for a bathroom pass and upheld the denial of his request for one, despite being the DOC's top medical official and Defendant Long's belief that it was "common sense" that Plaintiff should be able to

access a toilet when needed and it would not be medically advisable for someone with Plaintiff's condition to try to hold in their bowel movements. Id. at 28–29.

c. Analysis

Although Defendant Long is a medical professional, he had only oversight in reviewing and responding to Plaintiff's grievances. Commonwealth Defs.' Mot. at 14–15. The Court finds that Plaintiff's contentions that Defendant Long was deliberately indifferent are conclusory and not supported by the record. Fed. R. Civ. P. 56(c)(1). Defendant Long's testimony was that seeing a specialist had no real benefit to Plaintiff and there was not much a gastroenterologist could do. Long Dep. at 134:11–136:1. Moreover, Defendant Long testified that, with QI nurses, he reviewed Plaintiff's medical records and determined that the care was reasonable and appropriate because Plaintiff's overall health remained good, his diet was monitored and his BMI remained healthy, and lab work was performed and found no issues. Commonwealth Defs.' Reply at 13. Plaintiff's disagreement as to the proper medical treatment does not constitute an Eighth Amendment violation. Spruill, 372 F.3d at 235; Pearson, 850 F.3d at 543.

Furthermore, there is no evidence that Defendant Long contributed to the delay in Plaintiff seeing a gastroenterologist, as delays were due to "COVID backlogs" and community providers "could be booked out for six months, eight months, ten months." Benning-Smith Dep. at 55:1-4. Plaintiff's allegation about the delay in seeing a specialist is "unsupported by any evidence to show that any delay had an adverse effect on his condition." Bickel v. Miller, 446 F. App'x 409, 413 (3d Cir. 2011) (nonprecedential).

Therefore, summary judgment is **GRANTED** as to Defendant Long on Count I.

**3. Defendant Sorber**

a. Defendant's Contentions

Defendant Sorber argues that he is not a medical professional, does not make clinical decisions, and therefore lacks personal involvement. Commonwealth Defs.' Mot. at 6–9. Defendant Sorber further contends that he was "justified in believing that the prisoner [was] in capable hands" when under the care of medical staff and entitled to defer to the judgment of medical professionals. Id. at 7–9 (citing Spruill, 372 F.3d at 236). He argues he is not liable because he did not have contemporaneous knowledge of and acquiesced in the allegedly inadequate medical care of Plaintiff. Id. at 9. Defendant Sorber's involvement was limited to responding to Plaintiff's grievances/requests and sending a memo to Plaintiff informing him that the Inmate Disability Accommodations Committee had "approved the accommodation request for a single cell (Z code) due to documented gastrointestinal issues." Id. at 9–10. Although Defendant Sorber's response did not always grant the relief that Plaintiff wanted or did not grant it at first, he argues this does not amount to cruel and unusual punishment. Id. at 10.

Furthermore, Defendant Sorber contends Plaintiff fails to provide full context when describing the responses to his grievances. Commonwealth Defs.' Reply at 11. For instance, Plaintiff's December 15, 2021, grievance alleges that medical staff refused to see him, despite multiple requests. See Plf's Grievances at 9 (Grievance # 959737). But Defendant Sorber's response was:

> Upon review of available information, I find the grievance officer's response appropriate. As indicated in the initial review response, you were scheduled to be seen by medical staff on 12/15/2021. As such, there is no evidence to support your claim of deliberate indifference. Concerns related to a 1/5/2022 incident date will not be addressed in this appeal as it was not raised in the initial grievance. There is nothing further to add.

Id. at 12. Sorber notes his response refers to the Initial Review Response, which explained:

> No medical sick call request slip submitted nor received for 12/15/2021, however dental has you as a no show for 12/15/2021, as per Dental Assistant Ms. Lamison and signed-off by Dr. Kolber. Your current housing recommendations are: Ground level and lower bunk 09/09/2021 to 09/09/2022 and you have an approved order for an Ultrasound entered by Dr. Robinson.
>
> Grievance Denied - No interference with medical care.

Id. at 10. Defendant Sorber contends that to the extent that Plaintiff alleged that he "refused" to address the January 5, 2022, incident, that incident occurred after the initial grievance, was not included in said grievance, and would have been improper for Defendant Sorber to address in an Appeal Response. Commonwealth Defs.' Reply at 11–12. Defendant Sorber notes that Plaintiff should have filed a new grievance addressing the January 5, 2022, incident. Id.

Like Defendant Benning-Smith, Defendant Sorber also argues he is not responsible for Plaintiff's request slips and grievances, because a prison official who fails to respond to an inmate complaint regarding medical treatment is not deliberately indifferent when the prisoner was under the care of a doctor. Commonwealth Defs.' Mot. at 8, 8 n.2.

b. Plaintiff's Contentions

As discussed above, Plaintiff contends that because the DOC has a nondelegable duty to provide adequate medical care to inmates, DOC officials cannot abdicate such duties by contracting out medical care. Plf's Opp. at 16–17. Plaintiff argues that a reasonable jury could find that Defendant Sorber was deliberately indifferent to his medical needs, as he failed to take reasonable measures to address them in reviewing and responding to Plaintiff's grievances. Id. at 17–18. Plaintiff argues Defendant Sorber was on notice that he was not receiving adequate medical care but failed to address it. Id. at 5–6, 18–19, 22. Plaintiff argues that Defendant Sorber, as Superintendent, was responsible for reviewing and answering grievance appeals. Id. at 22.

Plaintiff alleges that Defendant Sorber's oversight included ensuring adequate provision of medical care, but he did not act to address Plaintiff's need for care, including being taken to a specialist to "establish care," when he was made aware of it. Id.

Plaintiff next contends that, like Defendant Benning-Smith, Defendant Sorber was aware of his medical condition and need for accommodations but failed to promptly provide him with them. Id. at 25–26. For example, Plaintiff argues that Defendant Sorber learned of his condition and need for a single cell as early as December 2021 but failed to take any action to help him get one, including responding to several grievance appeals and denying the single cell without addressing the request at all. Id. at 26. Plaintiff notes he finally got a single cell in March 2022. Id. at 26–27. However, Plaintiff alleges it was the two emergency room trips and Defendant Letizio's recommendation that prompted the DOC to finally approve him for one. Id. at 27. Plaintiff argues providing him with a single cell sooner was within Defendant Sorber's power, and he suddenly acted on Plaintiff's request right after Defendant Letizio recommended one, despite previously having done nothing. Id.

Moreover, Plaintiff argues he began explicitly requesting a bathroom pass in June 2022, but in July 2022, Defendant Sorber upheld the denial of a grievance, insisted that "bathroom passes are not provided to inmates" and scoffed at the notion that Plaintiff should get "special treatment." Id. at 27–28. Plaintiff alleges in October 2022, Defendant Sorber denied another grievance appeal regarding Plaintiff's access to the toilet and insisted the officer was correct not to let him in, although he later acknowledged that Plaintiff should not have been forced to wait to come in from the yard to use the toilet. Id. at 28 (citing Plf's SUMF, ¶¶ 186–96). Plaintiff argues Defendant Sorber did nothing to help him, even though he explained in the grievance that toilet access while he was out of his cell was an ongoing problem. Id. Plaintiff contends he received a bathroom pass

about a year and a half after he first began requesting one, and only after counsel intervened. Id. at 29.

c. Analysis

Defendant Sorber, as Superintendent, is not a medical professional and was thus entitled to defer to the judgment of medical professionals. Spruill, 372 F.3d at 236; Durmer, 991 F.2d at 69. Plaintiff alleges, but does not demonstrate, that Defendant Sorber had actual or constructive knowledge of his medical needs and that providers mistreated or failed to treat him. Spruill, 372 F.3d at 236. Defendant Sorber's only involvement was reviewing and responding to grievances, and he testified that he had to defer to the judgment of medical providers if the inmate was treated by them. Commonwealth Defs.' Reply at 11; Sorber Dep. at 102:13–103:2, 155:22–156:6. Likewise, Defendant Sorber testified that he was not aware of (1) Plaintiff's medical conditions and needs; (2) whether Plaintiff was taken for a follow-up visit after his emergency room visit; (2) that Plaintiff had been taken to the emergency room twice while at SCI-Phoenix; (3) Plaintiff's treatment plan; and (4) what Plaintiff was asking for in a "bathroom pass." Sorber Dep. at 88:7-13, 113:10-16, 117:7-17, 134:16-24, 156:2-6, 165:8–167:17.

As discussed, failure to respond to an inmate complaint regarding medical treatment is not deliberate indifference when the prisoner was under the care of a doctor, and Plaintiff was examined and treated by the SCI-Phoenix medical staff. See Part V.A.1; Plf's Medical Records.

Accordingly, Plaintiff cannot demonstrate that Defendant Sorber was deliberately indifferent, and summary judgment is **GRANTED** as to Defendant Sorber on Count I.

**4. Defendant Terra**

a. Defendant's Contentions

Like Defendants Benning-Smith and Sorber, Defendant Terra contends he is not a medical professional, does not make clinical decisions, and therefore lacks personal involvement. Commonwealth Defs.' Mot. at 6–9. Defendant Terra further contends that he was "justified in believing that the prisoner [was] in capable hands" when under the care of medical staff and entitled to defer to the judgment of medical professionals. Id. at 7–9 (citing Spruill, 372 F.3d at 236); see also Terra Dep. at 135:25–136:5.

Specifically, Defendant Terra argues he is not liable because he did not have contemporaneous knowledge of and acquiesced in the allegedly inadequate medical care of Plaintiff. Commonwealth Defs.' Mot. at 9. He argues that he was not aware that Plaintiff was not seen at his appointment with a specialist at Temple in October 2024, due to a scheduling error. Id. at 10 (citing Terra Dep. at 126:15-22). Defendant Terra also testified that any decision regarding offsite specialist care would come from a medical provider. Id. at 13 (citing Terra Dep. at 126:23–127:1). Moreover, Defendant Terra contends that Plaintiff ignores his rationale for believing that Plaintiff's medical needs were being met by SCI-Phoenix, because SCI Phoenix has more resources for medical care than most other Pennsylvania state correctional institutions and Plaintiff was constantly monitored by medical staff. Commonwealth Defs.' Reply at 12 (citing Terra Dep. at 134:2–135:3).

Like Defendant Benning-Smith, Defendant Terra also argues he is not responsible for Plaintiff's request slips and grievances, because a prison official who fails to respond to an inmate complaint regarding medical treatment is not deliberately indifferent when the prisoner was under the care of a doctor. Commonwealth Defs.' Mot. at 8, 8 n.2.

b. Plaintiff's Contentions

As discussed above, Plaintiff contends that because the DOC has a nondelegable duty to provide adequate medical care to inmates, DOC officials cannot abdicate such duties by contracting out medical care. Plf's Opp. at 16–17. Plaintiff argues that a reasonable jury could find that Defendant Terra was deliberately indifferent to his medical needs, as he failed to take reasonable measures to address them in reviewing and responding to Plaintiff's grievances. Id. at 17–18. Plaintiff argues Defendant Terra was on notice that he was not receiving adequate medical care but failed to address it. Id. at 5–6, 18–19, 23.

Specifically, Plaintiff argues that Defendant Terra, as Superintendent after Defendant Sorber, was responsible for reviewing and answering grievance appeals. Id. at 23. Plaintiff contends that Defendant Terra knew that his medical needs could not be met by the providers at SCI-Phoenix but testified that he remained unconcerned by the fact that Plaintiff had been delayed in being taken to a specialist for more than a year. Id. (citing Plf's Additional SUMF, ¶¶ 191–193). Plaintiff argues Defendant Terra reviewed multiple initial level grievance responses from staff members admitting that Plaintiff's care would need to be "determined after [a] GI consult" and that his specialist appointments had been "a long time coming." Id. Plaintiff alleges Defendant Terra was aware of the issue with wait times for specialist care, and could have spoken to his supervisor, BHCS, or DOC staff about Plaintiff's need for care, but did not. Id.

c. Analysis

Defendant Terra, as Superintendent, is not a medical professional and was thus entitled to defer to the judgment of medical professionals. Spruill, 372 F.3d at 236; Durmer, 991 F.2d at 69. Plaintiff's allegations that Defendant Terra had actual or constructive knowledge of his medical needs and that providers mistreated or failed to treat him are conclusory, which is insufficient at

summary judgment. Spruill, 372 F.3d at 236. Defendant Terra's only involvement was reviewing and responding to grievances, and he testified that he had to defer to the judgment of the medical providers if the inmate was treated by them. Commonwealth Defs.' Reply at 12; Terra Dep. at 135:25–136:5. Likewise, Defendant Terra testified that he was not aware of (1) Plaintiff's medical conditions and needs; (2) how soon Plaintiff should return for a follow-up visit from his March 2024 specialist appointment; (3) that Plaintiff was not seen at his appointment with a specialist at Temple Hospital in October 2024, due to a scheduling error; (4) that Plaintiff had been taken to the emergency room while at SCI-Phoenix; and (5) Plaintiff's "bathroom pass." Terra Dep. at 76:23–77:3, 79:21-25, 126:15-22, 133:20-23, 143:16-25. Moreover, there is no evidence that Defendant Terra contributed to the delay in Plaintiff seeing a specialist, as the October 2024 gastroenterologist appointment was cancelled due to a Temple scheduling error. Plaintiff's allegations are "unsupported by any evidence to show that any delay had an adverse effect on his condition." Bickel, 446 F. App'x at 413.

As discussed, failure to respond to an inmate complaint regarding medical treatment is not deliberate indifference when the prisoner was under the care of a doctor, and Plaintiff was examined and treated by the SCI-Phoenix medical staff. See Part V.A.1; Plf's Medical Records.

Accordingly, Plaintiff cannot demonstrate that Defendant Terra was deliberately indifferent, and summary judgment is **GRANTED** as to Defendant Terra on Count I.

### 5. Defendant Sipple

#### a. Defendant's Contentions

Likewise, Defendant Sipple contends she is not a medical professional, does not make clinical decisions, and therefore lacks personal involvement. Commonwealth Defs.' Mot. at 6–9. Defendant Sipple further argues she was "justified in believing that the prisoner [was] in capable

hands" when under the care of medical staff and entitled to defer to the judgment of medical professionals. Id. at 7–9 (citing Spruill, 372 F.3d at 236). She contends she did not have contemporaneous knowledge of and acquiesced in the allegedly inadequate medical care of Plaintiff. Id. at 9. Similarly, Defendant Sipple also argues she is not responsible for Plaintiff's request slips and grievances, because a prison official who fails to respond to an inmate complaint regarding medical treatment is not deliberately indifferent when the prisoner was under the care of a doctor. Id. at 8, 8 n.2.

Specifically, Defendant Sipple contends that she had no knowledge of (1) Plaintiff's medical history, conditions, or details of his nonstandard diet; (2) was not aware that he had been taken to the emergency room twice while at SCI-Phoenix; (3) did not know if his request for a consultation with a GI specialist had been approved or who would have approved it; (4) why he wanted or need a bathroom pass; (5) if he was ever issued a bathroom pass; or (6) "what a bathroom pass is." Id. at 9 (citing Sipple Dep. at 102:9–103:13, 128:14–130:21, 133:6-25, 138:8-22, 144:5-16). Her involvement was responding to Plaintiff's grievances and requests and sending a memo to Plaintiff informing him that the Inmate Disability Accommodations Committee had "approved the accommodation request for a single cell (Z code) due to documented gastrointestinal issues." Id. at 9–10. Although her response did not always grant the relief that Plaintiff wanted or did not grant it at first, she argues this does not amount to an Eighth Amendment violation. Id.

On reply, Defendant Sipple argues Plaintiff cherry-picks statements, when she provided logical explanations for her decision-making that any reasonable jury would accept as sound. Commonwealth Defs.' Reply at 9–11. For example, Plaintiff's version of Defendant Sipple's response to his March 15, 2022, grievance implies that she denied his grievance due to the specialist request being "submitted for approval[.]" Id. at 9 (citing Plf's Opp. at 21). However,

her Initial Review Response details all the treatment that Plaintiff received, not just that his consultation request was submitted for approval:

> PA Walsh documented your visit and consulted with Dr. Letizio as you were recently returned from the hospital and diagnosed with an ileus. The consultation for the Temple GI department was submitted for approval. Also you were recommended to continue to drink the Ensure and take all your medications. A recommendation for you to follow up with doctor lines was entered. Also two new prescriptions were ordered this date: Vitamin C tablet and B Complex Vitamin Capsule.

Plf's Grievances at 40 (Grievance # 970572).

Defendant Sipple further argues that Plaintiff alleges that, in response to his January 22, 2025, grievance, she "did not take any action to follow up on whether an appointment took place," but her Initial Review Response notes that Plaintiff refused to be admitted to the infirmary, was advised multiple times that he had an upcoming GI appointment in Spring 2025, received renewals for his medication and therapeutic diet, and was still being seen at sick call. Commonwealth Defs.' Reply at 10 (citing Plf's Grievances at 181–82 (Grievance # 1128954)); Sipple Dep. at 153:1–154:25. Defendant Sipple argues that Plaintiff's medical care was adequate and attentive, even if he did not see a specialist. Commonwealth Defs.' Reply at 10. She also testified that she could not prioritize which inmates would be transported to offsite medical appointments before others when there were limitations, as that power belonged to Defendant Letizio. Id. at 10–11.

b. Plaintiff's Contentions

As discussed, because the DOC has a nondelegable duty to provide adequate medical care to inmates, Plaintiff contends DOC officials cannot abdicate such duties by contracting out medical care. Plf's Opp. at 16–17. Plaintiff argues that a reasonable jury could find that Defendant Sipple was deliberately indifferent to his medical needs, as she failed to take reasonable measures to address them in reviewing and responding to Plaintiff's grievances. Id. at 17–18. Plaintiff argues

Defendant Sipple was charged with "the resolution of inmate health care grievances" and was on notice that he was not receiving adequate medical care but failed to take any action. Id. at 5–6, 18–19, 21–22.

For example, on March 15, 2022, Plaintiff alleges she denied Plaintiff's grievance where he stated that he had still not been seen by a GI specialist after his two emergency trips, claiming that a consultation request had been "submitted for approval." Id. at 21–22. Plaintiff alleges Defendant Sipple took no action to follow up on whether his appointment had ever been scheduled or occurred, and he was not seen by a specialist for another eight months. Id. Moreover, Plaintiff alleges in February 2025, Defendant Sipple was aware that Plaintiff's care was inadequate when she responded to his grievance that he had been awaiting an appointment with a specialist for more than a year, and she acknowledged that the appointment was "a long time coming." Id. at 22. Plaintiff alleges she testified that she would have checked to make sure his appointment had been scheduled at the time, but there was no scheduled appointment when she denied his grievance, she did not take any action to follow up on whether an appointment took place, and she did not know at the time of her deposition if he had ever been seen. Id.

Plaintiff next contends that, like Defendants Benning-Smith and Sorber, Defendant Sipple was aware of his medical condition and need for accommodations but failed to promptly provide him with them. Id. at 25–26. For example, Plaintiff argues that Defendant Sipple learned of his condition and need for a single cell as early as December 2021 but failed to take any action to help him get one, including responding to grievance appeals and denying the single cell without addressing the request at all. Id. at 26. Moreover, Plaintiff argues when Sipple responded to his request slip for a bathroom pass in July 2022, she similarly denied the request and took no action to facilitate his access to the toilet. Id. at 28–29. Plaintiff notes that although Defendant Sipple

said officers "should" be letting Plaintiff into his cell to use the toilet, she did nothing to ensure that they were doing so. Id.

c. Analysis

Defendant Sipple, as Deputy Superintendent, is not a medical professional and was thus entitled to defer to the judgment of medical professionals. Spruill, 372 F.3d at 236; Durmer, 991 F.2d at 69. Defendant Sipple's only involvement was reviewing and responding to grievances. Commonwealth Defs.' Reply at 9–11. Likewise, she testified that she was not aware (1) of Plaintiff's medical history, conditions, or details of his nonstandard diet; (2) that he had been taken to the emergency room twice while at SCI-Phoenix; (3) if his request for a consultation with a GI specialist had been approved or who would have approved it; (4) why he wanted or need a bathroom pass; (5) if he was ever issued a bathroom pass; or (6) "what a bathroom pass is." See Sipple Dep. at 102:9–103:13, 128:14–130:21, 133:6-25, 138:8-22, 144:5-16.

Moreover, there is no evidence that Defendant Sipple contributed to the delay in Plaintiff seeing a gastroenterologist, as delays were due to "COVID backlogs" and community providers could be booked out for months. Benning-Smith Dep. at 55:1-4. Plaintiff's allegations are "unsupported by any evidence to show that any delay had an adverse effect on his condition." Bickel, 446 F. App'x at 413.

As discussed, failure to respond to an inmate complaint regarding medical treatment is not deliberate indifference when the prisoner was under the care of a doctor, and Plaintiff was examined and treated by the SCI-Phoenix medical staff. See Part V.A.1; Plf's Medical Records.

Accordingly, Plaintiff cannot demonstrate that she was deliberately indifferent, and summary judgment is **GRANTED** as to Defendant Sipple on Count I.

**6. Defendant Huner**

a. Defendant's Contentions

Like the other Commonwealth Defendants, Defendant Huner contends she is not a medical professional, does not make clinical decisions, and lacks personal involvement. Commonwealth Defs.' Mot. at 6–9. Defendant Huner further argues she was "justified in believing that the prisoner [was] in capable hands" when under the care of medical staff and entitled to defer to the judgment of medical professionals. Id. at 7–9 (citing Spruill, 372 F.3d at 236). Although Defendant Huner is the Correctional Health Care Administrator ("CHCA") at SCI-Phoenix, she argues this position is not considered a medical professional because it is not the CHCA's role to order or supervise medical treatments, and the CHCA acts in a "management capacity" for administration of the health and dental departments of the prison, nursing staff, and independent contractors. Id. at 7 (citing Davis, 558 F. App'x at 150; Popovich v. Lamas, C.A. No. 13-1528, 2014 WL 939508, at *3 (M.D. Pa. Mar. 11, 2014); Josey v. Beard, C.A. No. 06-265, 2009 WL 1858250, at *7 & n.9 (W.D. Pa. Jun. 29, 2009)); see also id. at 12 n.4 (citing Brown v. Wetzel, C.A. No. 13-5469, 2014 WL 5493244, at *3 (E.D. Pa. Oct. 29, 2014) (Quiñones Alejandro, J.); Robinson v. Prison Health Servs., C.A. No. 10-7165, 2014 WL 2452132, at *6 (E.D. Pa. Jun. 2, 2014) (O'Neill, J.)).

Furthermore, she contends she did not have contemporaneous knowledge of and acquiesced in the allegedly inadequate medical care of Plaintiff. Commonwealth Defs.' Mot. at 9. She argues she did not have knowledge of Plaintiff's medical condition, including that he had multiple surgeries due to gunshot wounds, that he had portions of his small and large intestines removed, whether his condition was chronic, and whether he was charged for sick call visits. Id. at 10 (citing Huner Dep. at 145:17–146:18). She notes that all request slips at SCI-Phoenix are addressed to the DOC office over which she has administrative control, but there is no evidence

that she had any actual knowledge of Plaintiff's medical needs. Id. at 10–11. Defendant Huner contends that the one request slip addressed to her was answered by "M. Savage," not by her, and there is no evidence that she ever received, had knowledge of, or responded to the request slip. Id. at 11. Even if a subordinate employee processed the request, Defendant Huner contends there is no supervisory liability in § 1983 claims, and she may not be held liable for the actions of her subordinates. Id.

On reply, Defendant Huner contends that Plaintiff ignores her rational explanations for her decision-making that any reasonable jury would accept as sound. Commonwealth Defs.' Reply at 8–9. For example, in response to Plaintiff's January 6, 2022, grievance, she contends she gave a complete explanation as to why she did not consult any medical professionals during her review:

> So it's my understanding that the Einstein medical providers would have given him the care that they determined necessary[.] … I completed this grievance response after he was sent to Temple on 1/31/2022. … [I]t's my understanding that the Temple providers were either caring for him or have cared for him and discharged him with … their services provided.

Id. at 8 (citing Huner Dep. at 177:22–178:5). In response to Plaintiff's grievance regarding Defendant Walsh telling Plaintiff that there is tension because Plaintiff was "trying to sue" him, she explained that if she "see[s] something or hear[s] something that's inappropriate with the providers," then she "would let their supervisor know[,]" but here she understood that Wellpath would address their employee's behaviors as outlined by their HR policies and she would only follow up on it if the issue continues, because either it wasn't addressed or it was addressed and the issue remained. Id. at 8–9 (citing Huner Dep. at 224:1–225:25). She further argues Plaintiff ignores that he had been scheduled for an appointment earlier that month, but there had been a problem with Temple's scheduling, beyond the control of anyone at SCI-Phoenix. Id. at 9.

b. Plaintiff's Contentions

As discussed, because the DOC has a nondelegable duty to provide adequate medical care to inmates, Plaintiff contends DOC officials cannot abdicate such duties by contracting out medical care. Plf's Opp. at 16–17. Plaintiff argues that a reasonable jury could find that Defendant Huner was deliberately indifferent to his medical needs, as she failed to take reasonable measures to address them in reviewing and responding to Plaintiff's grievances. Id. at 17–18. Plaintiff argues she was on notice that he was not receiving adequate medical care but failed to address it. Id. at 5–6, 18–19, 20–21. Plaintiff contends Defendant Huner was responsible for coordinating the medical care provided at SCI-Phoenix and ensuring that providers were following DOC policies. Id. at 20. Plaintiff alleges he repeatedly sought her aid when he was denied the medical treatment he needed, but she repeatedly refused to act, even in instances she now acknowledges were inappropriate. Id. (citing Plf's Additional SUMF, ¶¶ 134–35, 145–46, 210–13, 245–47).

Furthermore, Plaintiff argues that Defendant Huner had reason to believe that Defendant Letizio was mistreating him, as she received numerous emails from him railing against Plaintiff and referring to this lawsuit. Id. (citing Plf's Additional SUMF, ¶¶ 288, 305–06, 310, 316, 323–325, 333, 341). Plaintiff contends that Defendant Huner was aware that there was a problem with access to specialists but took no action to facilitate medical care when he contacted her about the ongoing delays. Id. at 21. For example, Plaintiff argues that in a grievance, he explained that he had been waiting for an approved specialist appointment for almost eight months, but Defendant Huner denied it, claiming that his appointment would "be scheduled." Id. Plaintiff alleges he reached out requesting an update a month and a half later, and she disregarded his request. Id. (citing Plf's Additional SUMF, ¶¶ 248–49). Plaintiff further alleges that at the time, his

appointment still had not been scheduled, and he was not seen for another six months. Id. (citing Plf's Additional SUMF, ¶ 273).

Plaintiff next contends that, like the other Commonwealth Defendants, Defendant Huner was aware of his medical condition and need for accommodations but failed to promptly provide him with them. Id. at 25–26. For example, Plaintiff argues that Defendant Huner learned of his condition and need for a single cell as early as December 2021 but failed to take any action to help him get one, even though it was within her power. Id. at 26. Plaintiff argues that she suddenly acted on Plaintiff's request for a single cell right after Defendant Letizio recommended one, despite previously having done nothing with it. Id. at 26–27.

c. Analysis

First, this Court finds that Defendant Huner, as the CHCA, is not a medical professional and is thus entitled to defer to the judgment of medical professionals. Spruill, 372 F.3d at 236; Durmer, 991 F.2d at 69; Davis, 558 F. App'x at 150.

Second, Defendant Huner was involved in reviewing and responding to grievances. Plf's Opp. at 17–18. Even though all request slips at SCI-Phoenix are addressed to her DOC office, Plaintiff has not demonstrated that Defendant Huner had any actual or constructive knowledge of his medical needs and that providers mistreated or failed to treat him. Commonwealth Defs.' Mot. at 10–11; Spruill, 372 F.3d at 236. As she testified, she did not have knowledge of Plaintiff's medical condition, including that he had multiple surgeries due to gunshot wounds, that he had portions of his small and large intestines removed, whether his condition was chronic, and whether he was charged for sick call visits. Huner Dep. at 145:17–146:18. Even if she did have knowledge, she was entitled to defer to the judgment of the medical providers treating Plaintiff. Spruill, 372 F.3d at 236; Durmer, 991 F.2d at 69. Moreover, as discussed, failure to respond to an inmate

complaint regarding medical treatment is not deliberate indifference when the prisoner was under the care of a doctor, and Plaintiff was examined and treated by the SCI-Phoenix medical staff. See Part V.A.1; Plf's Medical Records.

Accordingly, Plaintiff cannot demonstrate that Defendant Huner was deliberately indifferent, and summary judgment is **GRANTED** as to Defendant Huner on Count I.

**7. Defendant LeClerc**

In Plaintiff's Consolidated Opposition, Plaintiff notes that he is no longer pursuing his claims against Defendant LeClerc and does not oppose the entry of summary judgment in his favor. See Plf's Opp. at 4 n.3. Therefore, summary judgment is **GRANTED** in favor of Defendant LeClerc as to Count I.

**8. Defendant Letizio**

a. Defendant's Contentions

First, Defendant Letizio argues that he was not deliberately indifferent to Plaintiff's medical needs, as Plaintiff received considerable, thorough, and ongoing medical treatment while at SCI-Phoenix, including various diagnostic tests, clinical examinations, prescription of medications, and emergency care when needed. ECF 157-2 ("Medical Defs.' Mot.") at 24. Defendant Letizio contends that what treatment should be undertaken is within the discretion of the medical provider, and deference should be given because "mere disagreements over medical judgment do not state Eighth Amendment claims." Id. at 23–25 (citing White v. Napoleon, 897 F.2d 103, 110 (3d Cir. 1990); Iseley v. Dragovich, 236 F. Supp. 2d. 472, 478 (E.D. Pa. 2002) (Robreno, J.); Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979)); see also ECF 176 ("Medical Defs.' Reply") at 11 (citing Gindraw v. Dendler, 967 F. Supp. 833, 836 (E.D. Pa. 1997) (DuBois, J.)). He further argues that the Eighth Amendment does not require that

a prisoner receives every medical treatment that he requests or that is available elsewhere. Medical Defs.' Mot. at 24 (citing Banks v. Mozingo, 2010 WL 11914707, at *17 (W.D. Pa. Feb. 26, 2010), report and recommendation adopted, 2010 WL 11914706 (W.D. Pa. Mar. 18, 2010), aff'd, 423 F. App'x 123 (3d Cir. 2011) (nonprecedential)). Moreover, an inmate's dissatisfaction with medical treatment entails nothing more than a disagreement over alternate treatment plans. Id. (citing Gause v. Diguglielmo, 339 F. App'x 132, 135–36 (3d Cir. 2009) (nonprecedential)).

Defendant Letizio contends that here, Plaintiff's medical records demonstrate that he was provided care (including access to specialists and emergency care when required) between November 2021 and July 2025 through regular sick call visits where providers attempted to address his needs by providing medications and other treatment, but Plaintiff often impeded these efforts with his own behavior and unwillingness to follow treatment plans. Id. Although Plaintiff disagrees when these visits occurred and believes that different judgments should have been made, Defendant Letizio argues this does not amount to an Eighth Amendment violation. Id. at 24–25.

Furthermore, Defendant Letizio argues that he was appropriately attentive to Plaintiff's complaints and endeavored to have him seen by a gastroenterologist after an ileus was detected. Medical Defs.' Reply at 2. Defendant Letizio acknowledged the discharge instructions from Einstein to follow up with trauma following Plaintiff's January 5, 2022, emergency room visit. Id. at 2–3. However, Defendant Letizio testified that he did not feel a follow-up with trauma was in Plaintiff's best interest, as they "would have done nothing for him" and it was more appropriate to follow up with gastroenterologist to establish care. Id. (citing Letizio Dep. at 116:5-9, 116:23-24, 117:1)). Defendant Letizio argues that a decision to not to send an inmate to a specialist does not support an Eighth Amendment claim, but at most, an issue of negligence. Id. at 2–5 (citing Lewis v. Wexford Health Sources, Inc., 2019 WL 1359804, at *8 (W.D. Pa. Mar. 26, 2019)). Defendant

Letizio contends this is not a case in which he did not send Plaintiff to any specialist. Id. at 4–5. Rather, he exercised medical decision-making in opting to send him to a different specialist, as he believed it was more medically necessary. Id.

Although Defendant Letizio acknowledged that the gastroenterologist appointment did not happen as quickly as planned (the appointment was scheduled for November 22, 2022), he testified he was not aware that the appointment had not been scheduled after he initially placed the request, nor that there were ongoing scheduling issues, because he was not directly involved with scheduling outside appointments. Id. at 5–6 (citing Letizio Dep. at 92:7-11, 154:23-24, 155:1-9, 157:8-15). Defendant Letizio contends there is no evidence that he acted with a culpable state of mind to support deliberate indifference. Id.

Furthermore, Defendant Letizio argues he cannot be held liable for the actions of subordinates because he was the medical director at SCI-Phoenix, as § 1983 liability cannot be predicated upon *respondeat superior*. Id. at 6 (citing Evancho v. Fisher, 423 F.3d 347, 353 (3d Cir. 2005); Santiago v. Warminster Twp., 629 F.3d 121, 129 (3d Cir. 2010)). Defendant Letizio contends there is no evidence to support such a claim, as he was not personally involved. Id.

Defendant Letizio next contends the records demonstrate that any alleged animus did not prevent Plaintiff from receiving care, as Plaintiff received medical care as medically necessary, not necessarily whenever Plaintiff believed was necessary. Id. at 7–9. Defendant Letizio argues that any animus is simply Plaintiff's perception stemming from disagreement with the medical providers' treatment decisions. Id. at 7.

Here, Plaintiff takes issue with two specific decisions: Plaintiff's need for Ensure and the antibiotic Xifaxan. Id. Defendant Letizio testified that he did not have a problem with the recommendation for the prescription of Ensure. Id. Defendant Letizio did not believe Ensure was

previously necessary based upon Plaintiff's clinical presentation (weight and physical assessment) but later prescribed it when it was recommended by the gastroenterologist. Id. at 7–8. Although Plaintiff may have preferred that he prescribed Ensure earlier, Defendant Letizio contends it was prescribed as medically indicated. Id. As for the Xifaxan, Defendant Letizio contends he required it to be DOT rather than KOP, based upon his medical decision to ensure that Plaintiff was taking the medication because if his symptoms improved with it, it was that. Id. at 8–9. Defendant Letizio testified that the medicine was expensive, and he was concerned that Plaintiff would not take the medication if it was KOP. Id. (citing Letizio Dep. at 230:2-22). Although Plaintiff was required to attend pill line, this was only for a limited time and was a temporary inconvenience, not deliberate indifference. Id. at 9.

Lastly, Defendant Letizio contends that to the extent that Plaintiff argues that medical providers were deliberately indifferent by charging copays for sick call visits, courts have found against it. Id. at 10 n.8 (citing Reynolds v. Wagner, 128 F.3d 166, 174 (3d Cir. 1997)).

b. Plaintiff's Contentions

In opposition, Plaintiff contends Defendant Letizio denied his treatment for non-medical reasons and prevented him from receiving recommended treatment for his condition. Plf's Opp. at 6–10 (citing Montanez v. Price, 154 F.4th 127, 140–41 (3d Cir. 2025)). Specifically, Plaintiff contends that Defendant Letizio knew he needed to see a specialist, and a jury could conclude that sending a prisoner to a specialist, but then refusing to follow the specialist's recommendation, is evidence of deliberate indifference. Id. at 7, 10 (citing Davis v. Pearson, No. 19-2403, 2021 WL 3051879 (3d Cir. July 20, 2021) (nonprecedential)). Plaintiff contends that repeated trips to a specialist do not foreclose deliberate indifference. Id. at 10 (citing Durmer, 991 F.2d at 68 n.9). Plaintiff further disputes that he ever "impeded" efforts to treat him, and that even if care was

provided, it was not sufficient to meet constitutional requirements. Id. at 7, 7 n.4 (citing Palakovic, 854 F.3d at 228; James v. Varano, No. 20-1246, 2023 WL 195162 (3d Cir. Jan. 17, 2023); Plf's Additional SUMF, ¶¶ 296–311 (dispute regarding Defendant Letizio thwarting Plaintiff's ability to access medication); Plf's Resp. to Medical Defs.' SUMF, ¶ 76 (dispute regarding failure to accommodate his disability when providing medical care)).

Plaintiff argues that Defendant Letizio acknowledged as early as February 2022 that Plaintiff needed to see a gastroenterologist "to establish care," but failed to take reasonable measures to ensure that this occurred, including not submitting a consultation request until May 2022. Id. at 8–9. Plaintiff alleges he had not established care with a specialist by September 2022 (and no appointment had been scheduled yet, which Defendant Letizio knew). Id. at 9. Plaintiff argues Defendant Letizio admits that he could have addressed this delay with the staff responsible for scheduling off-site appointments but failed to do so. Id. Plaintiff contends that his first appointment with a gastroenterologist was scheduled for November 22, 2022, and Defendant Letizio acknowledged this was not a reasonable amount of time to wait to see a specialist. Id.[16] Plaintiff further argues that Defendant Letizio acknowledged that in August 2023, Plaintiff still had not established care with a gastroenterologist. Id. Plaintiff alleges that by October 2023, he had two telemedicine consults with a gastroenterologist and had undergone diagnostic procedures with another, but there was still no treatment plan or continuity of care. Id. at 10 (citing Plf's Additional SUMF, ¶¶ 175, 181, 185, 206). Plaintiff alleges that Dr. O'Conner, who performed the

[16] Plaintiff further contends Defendant Letizio did nothing to ensure that the specialist would have his medical records—despite acknowledging that it is important for specialists to have their patients' prior medical records. Plf's Opp. at 9 (citing Plf's Additional SUMF, ¶¶ 161–63). Plaintiff alleges the specialist was unable to provide comprehensive recommendations because of this. Id. (citing Plf's Additional SUMF, ¶¶ 171–78).

diagnostic procedures in October 2023, requested that Plaintiff return at the next available appointment, but Defendant Letizio did not take any steps to schedule one. Id.

Moreover, Plaintiff contends that Defendant Letizio prevented him from receiving medical care because of animus. Id. at 10–15 (citing Pearson, 850 F.3d at 537; Romero v. Ahsan, 827 F. App'x 222, 226–27 (3d Cir. 2020) (nonprecedential); Durham v. Kelley, 82 F.4th 217, 230 (3d Cir. 2023); Spruill, 372 F.3d at 237). Plaintiff alleges when Defendant Letizio submitted a request for a specialist appointment in January 2024, it was only because his attorney told him the Court was going to order it, and Defendant Letizio's attitude towards Plaintiff had changed once he learned about the lawsuit. Id. at 10 (citing Plf's Additional SUMF, ¶¶ 223–24, 288). Plaintiff alleges Letizio initially had a positive impression of him, describing him as "very polite" and "not somebody that I would think would be in prison." Id. Plaintiff alleges that changed in August 2023, as Defendant Letizio suddenly was describing him as a "huge manipulator," and claiming he was "abusing the sick call process" and exaggerating his symptoms because of this lawsuit, despite acknowledging the objective bases for Plaintiff's symptoms. Id. at 10–11.

Next, Plaintiff argues that Defendant Letizio thwarted three recommendations from the March 2024 appointment. Id. at 12.

- First, Plaintiff contends Defendant Letizio interfered with the scheduling of the follow-up appointment CRNP Thurston ordered. Id. On March 5, 2024, an NP at SCI-Phoenix submitted a consultation request based on that recommendation, noting that it was a request for a follow-up visit with a gastroenterologist. Id. Plaintiff alleges two days later, Defendant Letizio cancelled the request, stating that the provider needed to explain why the visit was medically necessary and could not be done on-site. Id. Plaintiff argues Defendant Letizio submitted a new consultation request, noting

Plaintiff's "frequent visits" to medical, accusing him of "complete manipulation," and that Plaintiff "now has any attorney" and Defendant Letizio had "discussed this case with Wellpath[']s attorney on a rather frequent basis." Id. Plaintiff argues this appointment was not even scheduled for over a year and finally occurred on June 5, 2025. Id. Plaintiff contends that while awaiting this appointment, he continued to experience and report ongoing symptoms, but Defendant Letizio did nothing to ensure that the appointment happened sooner. Id. at 12–13.

- Second, CRNP Thurston prescribed Ensure, but Plaintiff alleges Defendant Letizio refused to provide it (despite testifying that he had "no problem" with Plaintiff getting it). Id. at 13. Plaintiff contends that a reasonable jury could conclude that reliance on Plaintiff's BMI was a pretext, as the specialist recommended it and Defendant Walsh acknowledged that someone with Plaintiff's condition could benefit from Ensure, even if his weight was stable. Id. Moreover, Plaintiff alleges Defendant Letizio's purported perception of Plaintiff's weight was distorted, as he claimed Plaintiff was "obese" and had gained 50 pounds since he first met him, but admitted at his deposition that Plaintiff had only gained 20 pounds and was not obese. Id.
- Third, Plaintiff alleges CRNP Thurston prescribed Xifaxan, but Defendant Letizio prevented him from receiving it. Id. at 13–14. Plaintiff argues that Defendant Letizio insisted that the medication be designated DOT, such that Plaintiff would have to go to pill line to receive it. Id. at 14. Plaintiff contends that Xifaxan is not the type of medication that is typically designated DOT, and other inmates at SCI-Phoenix were provided it KOP. Id. Plaintiff further alleges no one told him that he needed to go to medical to get the medication, so he did not receive it. Id. Plaintiff argues that

Defendant Letizio doubled down when he explained that having to stand in line for his medication three times a day was burdensome and stated that if Plaintiff "wants to use the excuse of his condition so be it," and instructing staff that "nobody is to change it to KOP for any reason." Id. Plaintiff alleges Defendant Letizio claimed that Plaintiff was "noncompliant" with treatment and Plaintiff not taking the medication would "confirm that he's not suffering as much as he's playing out." Id. Plaintiff alleges Defendant Letizio claimed in an email to Defendant Huner and other staff that Plaintiff was "playing a game with him and his attorney" and declared, "Only makes him look terrible and the DOC and Wellpath look great." Id.

c. Analysis

Here, the record does not demonstrate that Defendant Letizio was deliberately indifferent to Plaintiff's medical needs. Courts are generally reluctant to second guess medical judgment where an inmate has received medical treatment, and deference is usually given to prison medical authorities. Inmates of Allegheny Cty. Jail, 612 F.2d at 762. Plaintiff's medical records establish that he was regularly provided care between November 2021 and July 2025 through regular sick call visits, lab work, and access to specialists and emergency care when required. See generally Plf's Medical Records. Plaintiff argues he should have been seen by a specialist sooner and Defendant Letizio should have followed the specialist's recommendations, but "mere disagreements over medical judgment do not state Eighth Amendment claims." Napoleon, 897 F.2d at 110. The record does not show that Defendant Letizio ignored Plaintiff or refused to treat him, nor is there evidence that clinical decisions such as sending Plaintiff to a gastroenterologist instead of a trauma specialist to establish care, prescribing Ensure only after the specialist

recommended it, or making Xifaxan DOT instead of KOP, was outside the scope of reasonable professional judgment.

Furthermore, the record does not demonstrate that Defendant Letizio contributed to the delay in Plaintiff seeing a gastroenterologist, as delays were due to "COVID backlogs" and community providers could be booked out for months. Benning-Smith Dep. at 55:1-4. The October 2024 appointment was cancelled due to a Temple scheduling error, outside the control of anyone at SCI-Phoenix. Plaintiff's allegations are "unsupported by any evidence to show that any delay had an adverse effect on his condition." Bickel, 446 F. App'x at 413.

Considering the totality of the circumstances of the care Defendant Letizio provided to Plaintiff, the Court finds no reasonable basis to conclude he acted with deliberate indifference to Plaintiff's serious medical needs. Accordingly, summary judgment is **GRANTED** in favor of Defendant Letizio as to Count I.

**9. Defendant Bora Saika**

In Plaintiff's Consolidated Opposition, Plaintiff notes that he is no longer pursuing his claims against Defendant Bora Saika and does not oppose the entry of summary judgment in her favor. See Plf's Opp. at 4 n.3. Therefore, summary judgment is **GRANTED** in favor of Defendant Bora Saika as to Count I.

**10. Defendant Walsh**

a. Defendant's Contentions

Like Defendant Letizio, Defendant Walsh argues that he was not deliberately indifferent to Plaintiff's medical needs, as Plaintiff received considerable, thorough, and ongoing medical treatment while at SCI-Phoenix. Medical Defs.' Mot. at 24. Although Plaintiff disagrees when

these visits occurred and believes that different judgments should have been made, Defendant Walsh argues this does not amount to an Eighth Amendment violation. Id. at 24–25.

Defendant Walsh contends that he was following SCI-Phoenix policy, as he testified that after the COVID-19 pandemic, medical providers were instructed to limit sick call visits to one medical complaint. Medical Defs.' Reply at 9–12 (citing Wash Dep. at 73:16-23). This policy was enacted for various reasons, including ensuring more patients could be seen and providing greater social distancing in the waiting room. Id. at 10 (citing Walsh Dep. at 73:24–75:3). Defendant Walsh testified that he enforced the rule with "pretty much everybody" and it was up to the provider to determine if one medical complaint was related to another such that both could be considered at the same sick call visit. Id. (citing Walsh Dep. at 76:19-21, 161:10-24). Although Defendant Walsh enforced this policy with Plaintiff, he contends it did not impede Plaintiff from obtaining treatment, as Plaintiff came to sick call nearly every day. Id. (citing Walsh Dep. at 163:8-15). Plaintiff argues that Defendant Walsh "downplay[ed] his symptoms and assum[ed] that he was just trying to get 'something that the average prisoner doesn't get,'" but Defendant Walsh testified that he believed Plaintiff was at times exaggerating his symptoms, based upon his clinical observations. Id. at 10–11 (citing Walsh Dep. at 153:22–154:3).

Lastly, Defendant Walsh argues that even if his medical decisions with respect to Plaintiff's treatment were incorrect, this does not rise to the level of a constitutional violation. Id. at 11–12 (citing Cobbs v. Caputo, 578 F. App'x 84, 85 (3d Cir. 2014) (nonprecedential)).

b. Plaintiff's Contentions

In opposition, Plaintiff argues there is evidence that Defendant Walsh was deliberately indifferent to his medical needs by repeatedly delaying and denying medical care for non-medical reasons, including by unreasonably interpreting DOC policy to truncate medical appointments and

claiming that his symptoms were fabricated to deny his need for care. Plf's Opp. at 15–16. Plaintiff argues this was not professional judgment but rather personal dislike for Plaintiff due to the lawsuit. Id. at 15 (citing Durham, 82 F.4th at 230; Romero, 827 F. App'x at 226–27).

Plaintiff contends that Defendant Walsh denied care by insisting that he could not address more than one symptom at a single appointment and sometimes completely refused to treat Plaintiff. Id. at 15–16. Plaintiff notes that other codefendants agreed that Defendant Walsh's refusal to treat Plaintiff for his medical needs was inappropriate, as, for example, Defendant Long testified that the direction to only treat "one issue" was "not the direction [BHCS] ever gave," and that the practice is not "good medicine." Id. (citing Plf's Additional SUMF, ¶ 152; Medical Defs.' SUMF, ¶ 36; Plf's Response to Medical Defs.' SUMF, ¶¶ 36, 65).

Plaintiff further argues Defendant Walsh was indifferent to his medical needs by downplaying his symptoms and assuming that he was just trying to get "something that the average prisoner doesn't get," despite an objective basis for Plaintiff's suffering. Id. at 16 (citing Plf's Additional SUMF, ¶¶ 279–82). Plaintiff alleges that once Defendant Walsh became aware of his lawsuit, he downplayed Plaintiff's symptoms. Id. Plaintiff argues this disregard for Plaintiff's suffering could support the finding that Defendant Walsh was deliberately indifferent. Id.

c. Analysis

Here, the record does not demonstrate that Defendant Walsh was deliberately indifferent. As discussed, courts are generally reluctant to second guess medical judgment where an inmate has received medical treatment, and deference is usually given to prison medical authorities. Inmates of Allegheny Cty. Jail, 612 F.2d at 762. Plaintiff's medical records establish that he was provided care almost every day between November 2021 and July 2025. See generally Plf's Medical Records.

Plaintiff's primary argument is that Defendant Walsh should not have limited his sick call visits to one complaint and should not have "downplay[ed]" Plaintiff's symptoms. Plf's Opp. at 15–16. But Plaintiff has not demonstrated that Defendant Walsh was deliberately indifferent, as he continued to treat Plaintiff (and never refused to treat him, but rather, Plaintiff refused to be seen by Defendant Walsh, see Plf's Medical Records at 51). See Pearson, 850 F.3d at 538. There is also no objective evidence that Plaintiff's treatment was outside the scope of reasonable professional judgment, and Plaintiff's arguments are really a disagreement as to the proper medical treatment. See id. The "one issue per sick call visit" was established for various reasons, including to allow providers to see more patients and to allow for greater social distancing during the COVID-19 pandemic, and it was up to the provider to determine whether to enforce the rule. Walsh Dep. at 73:16–75:3, 76:19-21, 161:10-24. Defendant Walsh also testified that he believed Plaintiff was exaggerating his symptoms, based upon his clinical presentation. Id. at 153:22–154:3. Even if Defendant Walsh's medical decisions were incorrect, negligent treatment does not give rise to an Eighth Amendment violation. Estelle, 429 U.S. at 105–06.

Furthermore, as discussed, the record does not demonstrate that Defendant Walsh contributed to the delay in Plaintiff seeing a gastroenterologist. See Part V.A.8. Plaintiff's allegations are "unsupported by any evidence to show that any delay had an adverse effect on his condition." Bickel, 446 F. App'x at 413. Accordingly, summary judgment is **GRANTED** in favor of Defendant Walsh as to Count I.

### B. Count II: 42 U.S.C. § 1983 – Eighth Amendment – Supervisory Liability

Section 1983 liability cannot be predicated on *respondeat superior*. Barkes, 766 F.3d at 316. Thus, supervisory liability only attaches if the supervisor (1) "with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused

[the] constitutional harm" or (2) personally "participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced" in a subordinate's unconstitutional conduct. A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr., 372 F.3d 572, 586 (3d Cir. 2004) (alteration in original).

Here, Plaintiff maintains that he is proceeding under the first theory: that Defendants Benning-Smith and Long are liable for establishing and implementing practices and customs that caused his harm. Plf's Opp. at 29–34.[17] Under a policy-practice-custom theory, a plaintiff must identify a supervisory policy or procedure that the supervisor defendant failed to implement, and establish that: (1) the policy or procedures in effect at the time of the alleged injury created an unreasonable risk of a constitutional violation; (2) the defendant-official was aware that the policy created an unreasonable risk; (3) the defendant was indifferent to that risk; and (4) the constitutional injury was caused by the failure to implement the supervisory procedure. Barkes, 766 F.3d at 317 (citing Sample v. Diecks, 885 F.2d 1099, 1118 (3d Cir. 1989)).

**1. Defendant Benning-Smith**

a. Defendant's Contentions

First, Defendant Benning-Smith contends that she cannot be liable because she is not the supervisor of the individuals who provided the allegedly negligent care of Plaintiff, as those individuals were employees of Wellpath, and liability cannot be predicated on *respondeat superior*. Commonwealth Defs.' Mot. at 16–17 (citing Ashcroft v. Iqbal, 556 U.S. 662, 676–77

[17] In Commonwealth Defendants' Motion, they primarily argue that Plaintiff's supervisory liability claim is based upon a knowledge and acquiescence theory. Commonwealth Defs.' Mot. at 15–21; see also Commonwealth Defs.' Reply at 14–17. However, in his Opposition, Plaintiff clarifies that he is proceeding on a policy-practice-custom theory. Plf's Opp. at 29–34. Therefore, the Court will only address the Parties' arguments as it pertains to a policy-practice-custom theory. Importantly, Defendants Benning-Smith and Long argue Monell is not applicable here as they are not municipalities, which Plaintiff concedes. Commonwealth Defs.' Mot. at 20–21; Plf's Opp. at 30 n.10.

(2009); Polk Cnty. v. Dodson, 454 U.S. 312, 325 (1981)). Instead, supervisory liability may attach only if the supervisor personally "participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced" in a subordinate's unconstitutional conduct. Id. (citing A.M., 372 F.3d at 586).

Second, Defendant Benning-Smith contends that Plaintiff has not and cannot cite a specific supervisory practice, procedure, or custom that she employed and/or maintained that violated Plaintiff's right to medical care. Commonwealth Defs.' Mot. at 19–21; Commonwealth Defs.' Reply at 14–17. She argues that general allegations of not reaching appropriate conclusions for grievance appeals are insufficient for a policy-practice-custom theory and are nothing more than allegations that she was not doing her job well. Commonwealth Defs.' Mot. at 19–20 (citing Beers v. Northumberland Cnty., No. 4:22-CV-01101, 2023 WL 2469905, at *6 (M.D. Pa. Mar. 10, 2023)). According to Defendant Benning-Smith, the evidence demonstrates that any "delay" in providing Plaintiff with a specialist appointment was beyond her control, who always did her best by all inmates, including Plaintiff, given the limited resources. Commonwealth Defs.' Reply at 14–16. Given the limitations presented, she had to prioritize men with life-threatening conditions like cancer over men with incurable conditions like Plaintiff. Id.

For example, Defendant Benning-Smith contends that she is not in charge of the DOC budget, including hiring officers to transport inmates to visits, and cannot force specialists to schedule patients. Id. at 14–15. She notes it can generally be difficult for someone not in custody to schedule a specialist appointment for a non-life-threatening condition, and many specialists will not accept prisoner patients. Id. She even testified that "[u]nfortunately, there's nothing to do if appointments aren't available." Id. (citing Benning-Smith Dep. at 58:15-16). Moreover, she noted that "COVID backlogs" were due to "working with community providers and they could be

booked out for six months, eight months, ten months." Id. at 15–16 (citing Benning-Smith Dep. at 55:1-4). Defendant Benning-Smith further stated that she "can speak to the leadership at central office that, you know, this is a concern and that we have a lot of offsites as far as vacancies and as far as CO staffing. Unfortunately, the [DOC] is under the governor's budget office and when they give us a complement, we're not able to hire more complement. They have to approve that." Id. (citing Benning-Smith Dep. at 59:14-20). However, she noted that she raised a concern to leadership about offsite visits. Id. (citing Benning-Smith Dep. at 59:21-24).

Finally, Defendant Benning-Smith argues the cases Plaintiff cites do not support his allegation that, as Defendant Benning-Smith's "job[] included creating and enforcing policies that ensure adequate medical care is provided to the incarcerated population, failing to do so despite awareness of patterns of misconduct allows a jury to find them liable." Id. at 16–17. She contends there were no "patterns of misconduct" and the case law Plaintiff cites concerns allegations of supervisors ignoring police brutality and corruption, which is not related nor comparable to supervisors of medical care in a correctional system. Id.

b. Plaintiff's Contentions

In opposition, Plaintiff argues Defendant Benning-Smith is liable for establishing and implementing practices and customs that caused his harm. Plf's Opp. at 29–34 (citing A.M., 372 F.3d at 586). Plaintiff argues that Defendant Benning-Smith, as the BHCS Director, is responsible for developing policies to ensure adequate medical care throughout the DOC and monitoring medical services for quality. Id. at 30. Plaintiff contends Defendant Benning-Smith is not shielded by the fact that the DOC contracts with Wellpath to provide medical care. Id. at 30–31 (citing Morgan-Mapp v. George W. Hill Corr. Facility, No. CIV A 07-2949, 2008 WL 4211699, at *15 (E.D. Pa. Sept. 12, 2008) (Schiller, J.)).

Plaintiff contends Defendant Benning-Smith "failed to adequately respond" to complaints that delays in specialist care were causing harm to incarcerated patients, including Plaintiff. Id. at 32 (citing Beers-Capitol v. Whetzel, 256 F.3d 120, 136 (3d Cir. 2001)). Plaintiff argues she maintained a practice of allowing delays in medical care for nonmedical reasons, due to transportation and staffing inadequacies. Id. at 31–32 (citing Parkell v. Danberg, 833 F.3d 313, 339 (3d Cir. 2016)). Plaintiff argues the widespread delay of specialist care in the DOC is largely due to a predetermined number of "trips" to outside providers allotted per day and the failure of scheduling staff to contact providers to schedule appointments in a timely manner. Id. at 31. Plaintiff argues that Defendant Benning-Smith attempts to deflect responsibility for the delays while acknowledging the non-medical factors impacting wait times, and this demonstrates deliberate indifference. Id. (citing Palakovic, 854 F.3d at 228–29, 229 n.24). Plaintiff points to her awareness of long wait times for specialist care and her testimony that she could have taken steps to address the issue but did not do so. Id. at 32.

Second, Plaintiff contends that Defendant Benning-Smith adopted a practice of providing no meaningful oversight of medical care in the DOC because she consistently failed to identify or correct inadequacies in medical treatment and other wrongdoing by medical providers. Id. at 32–34 (citing Black-Meadows v. Deptford Twp., No. CV 20-6951 (JHR/AMD), 2022 WL 22896230 (D.N.J. Aug. 4, 2022); Sarvey v. Wetzel, No. 16-157, 2019 WL 235322, at *5–9 (W.D. Pa. Jan. 16, 2019) (on summary judgment, identifying policies or practices regarding sexual abuse in prisons, but failing to establish a pattern of injuries)). Plaintiff argues that she acknowledges that filing a grievance is the only mechanism an inmate has to seek oversight of their medical care but routinely concluded that the care being provided was "reasonable and appropriate" even when DOC staff admitted to unjustified delays in care or other failings of medical staff. Id. at 33.

Plaintiff also points to her testimony that she does not take any corrective action when her review reveals violations of DOC policy. Id. (citing Plf's Additional SUMF, ¶ 21). Plaintiff argues this created an unreasonable risk of inadequate medical care going unaddressed. Id. at 33–34. Plaintiff contends the custom of failing to identify and correct wrongdoing in grievance appeals caused his harm by allowing deviations from the standard of care to continue unaddressed. Id.

Plaintiff further argues that Defendant Benning-Smith's failure to undertake adequate investigations or correct apparent misconduct amounts to deliberate indifference. Id. at 34 (citing White v. City of Vineland, 500 F. Supp. 3d 295, 308 (D.N.J. 2020) (on summary judgment, plaintiffs demonstrated that the chief of police was aware that internal affairs did not conduct full investigations concerning the excessive use of force and did not correct it)). Plaintiff notes that Defendant Benning-Smith's job included creating and enforcing policies that ensure adequate medical care is provided to inmates, and failing to do so despite awareness of patterns of misconduct allows a jury to find her liable. Id. (citing Figueroa v. City of Camden, No. 09-4343, 2012 WL 3756974, at *11 (D.N.J. Aug. 28, 2012) (on summary judgment, dispute of fact on supervisory liability claim over whether the manager of the police department had primary responsibility for training and discipline, such that he would be on notice of a custom or policy of tolerating unconstitutional conduct by officers); Kelley v. Reyes, No. 19-17911, 2025 WL 618207, at *20 (D.N.J. Feb. 26, 2025) (denial of summary judgment where record established evidence of custom of PPD overlooking or mishandling police officer misconduct)).

c. Analysis

Plaintiff alleges a policy-practice-custom basis, whereby he argues that Defendant Benning-Smith failed to identify or correct inadequacies in medical treatment and other wrongdoing by medical providers. Plf's Opp. at 29–34. However, the Court finds these are simply

general allegations of not reaching appropriate conclusions for grievance appeals (based on what Plaintiff wants the conclusion to be) and are insufficiently specific enough for supervisory liability. Barkes, 766 F.3d at 319–20. Furthermore, in grievance reviews, Defendant Benning-Smith would consult with Defendant Long and respond that the care provided was "reasonable and appropriate" when inmates, including Plaintiff, were being seen and treated by medical staff. Benning-Smith Dep. at 67:5-17, 122:3-6, 123:3-24. Defendant Benning-Smith would appropriately defer to the medical staff's clinical decisions. Durmer, 991 F.2d at 69; Spruill, 372 F.3d at 236. However, Defendant Benning-Smith upheld inmate grievances when there were issues, such as when Plaintiff had a delay in being scheduled for sick call in December 2021, when no follow up was scheduled after Plaintiff's emergency room visit in January 2022, or acknowledged that seeing the specialist for a follow-up appointment was "a long time coming." See Plf's Exhibit 22 (Grievance # 960646); Plf's Grievances at 18 (Grievance # 962828), 182 (Grievance # 1128954).

Moreover, any "delay" in accessing medical care through specialist appointments was not due to any policy, practice, or custom of Defendant Benning-Smith or the DOC. A.M., 372 F.3d at 586; Barkes, 766 F.3d at 317. It is generally difficult to schedule a specialist appointment, many specialists will not accept prisoner patients, and there was nothing that Defendant Benning-Smith or the DOC could do if appointments were not available. See Benning-Smith Dep. at 55:1-4, 58:15-16. This was unfortunately compounded by "COVID backlogs" and providers being "booked out for six months, eight months, ten months." Id. Furthermore, the cases Plaintiff cites in support pertain to customs or policies of misconduct in police departments, not prisons, and are therefore inapplicable to the instant case. See Commonwealth Defs.' Reply at 16–17.

Beyond general conclusory allegations, Plaintiff also has not demonstrated that Defendant Benning-Smith failed to adequately respond to a pattern of past occurrences of injuries like

Plaintiff's and has not established that the risk of constitutionally cognizable harm was "so great and so obvious that the risk and the failure of supervisory officials to respond" to support a finding of supervisory liability. Beers-Capitol, 256 F.3d at 136–37 (citing Sample, 885 F.2d at 1118). Plaintiff submits grievance forms from other inmates, but they have different medical needs and conditions that are completely unrelated to Plaintiff's medical conditions and lawsuit. See Plf's Additional SUMF, ¶¶ 34–48; ECF 167-5 ("Plf's Exhibit 44").

Therefore, summary judgment is **GRANTED** in favor of Defendant Benning-Smith as to Count II.

**2. Defendant Long**

a. Defendant's Contentions

Like Defendant Benning-Smith, Defendant Long argues he cannot be liable because he is not the supervisor of the individuals who provided the allegedly negligent care of Plaintiff, as those individuals were employees of Wellpath, and liability cannot be predicated on *respondeat superior*. Commonwealth Defs.' Mot. at 16–17 (citing Iqbal, 556 U.S. at 676–77; Dodson, 454 U.S. at 325). For example, Defendant Walsh, who was employed by Wellpath as a physician assistant, testified that Defendant Letizio, as the medical director at SCI-Phoenix, supervised all the physician assistants and nurse practitioners. Walsh Dep. at 51:16–52:9, 54:1–55:16.

Similarly, Defendant Long argues that Plaintiff has not and cannot cite a specific supervisory practice, procedure, or custom that he employed that violated Plaintiff's right to medical care. Commonwealth Defs.' Mot. at 19–21; Commonwealth Defs.' Reply at 14–17. He contends that general allegations of not reaching appropriate conclusions for grievance appeals are insufficient for a policy-practice-custom theory and are nothing more than allegations that he was not doing his job well. Commonwealth Defs.' Mot. at 19–20 (citing Beers, 2023 WL 2469905, at

*6). Defendant Long argues the evidence demonstrates that any "delay" in providing Plaintiff with a specialist appointment was beyond his control, given the limited resources. Commonwealth Defs.' Reply at 14–16. Defendant Long contends that he is not in charge of the DOC budget, including hiring officers to transport inmates to visits, and cannot force specialists to schedule patients. Id. at 14–15. Defendant Long testified that it could take months to schedule specialist appointments and he had no control over them. Id. at 15 (citing Long Dep. at 70:11-24).

Lastly, Defendant Long argues the cases Plaintiff cites does not support his allegation that, as Defendant Long's "job[] included creating and enforcing policies that ensure adequate medical care is provided to the incarcerated population, failing to do so despite awareness of patterns of misconduct allows a jury to find them liable." Id. at 16–17. Defendant Long contends there were no "patterns of misconduct" and the case law Plaintiff cites concerns allegations of supervisors ignoring police brutality and corruption, which is not related nor comparable to supervisors of medical care in a correctional system. Id.

b. Plaintiff's Contentions

In opposition, Plaintiff argues Defendant Long is liable for establishing and implementing practices and customs that caused his harm. Plf's Opp. at 29–34 (citing A.M., 372 F.3d at 586). Plaintiff argues that Defendant Long, as the Chief of Clinical Services, was the highest-ranking medical professional involved in formulating policies for medical care throughout DOC. Id. at 30. His responsibilities included "look[ing] over the entire health care of all the correctional units," addressing "any of the problems that were brought about from the different institutions," and "[w]orking closely with the vendor and the state medical director for the vendors, policies and procedures." Id. Plaintiff contends Defendant Long is not shielded by the fact that the DOC

contracts with Wellpath to provide medical care. Id. at 30–31 (citing Morgan-Mapp, 2008 WL 4211699, at *15).

Plaintiff argues that, like Defendant Benning-Smith, Defendant Long maintained a practice of allowing delays in medical care for nonmedical reasons, due to transportation and staffing inadequacies. Id. at 31–32 (citing Parkell, 833 F.3d at 339). Plaintiff contends that Defendant Long attempts to deflect responsibility for the delays while acknowledging the non-medical factors impacting wait times, and this demonstrates deliberate indifference. Id. at 31 (citing Palakovic, 854 F.3d at 228–29, 229 n.24). Plaintiff further contends that Defendant Long, as a physician, knows that it is necessary to provide specialist care when a patient's needs cannot be met by general practitioners and understood logistical factors impacting delays, despite his claim that he had "no control" over wait times for specialist care. Id. at 32. Plaintiff contends that Defendant Long was aware of delays in access to care but took no steps to address the issue. Id.

Furthermore, Plaintiff contends that Defendant Long "failed to adequately respond" to complaints that delays in specialist care were causing harm to inmates, including Plaintiff. Id. (citing Beers-Capitol, 256 F.3d at 136). Plaintiff argues Defendant Long adopted a practice of providing no meaningful oversight of medical care in the DOC because he consistently failed to identify or correct inadequacies in medical treatment and other wrongdoing by medical providers. Id. at 32–34. Plaintiff argues that Defendant Long acknowledges that filing a grievance is the only mechanism an inmate has to seek oversight of their medical care but routinely concluded that the care being provided was "reasonable and appropriate" even when DOC staff admitted to unjustified delays in care or other failings of medical staff. Id. at 33. Plaintiff points to Defendant Long's testimony that even where his review uncovered conduct that was not "good medicine" or violated DOC policy, he took no action so long as he did not see a "bad outcome," but Defendant

Long had no way of knowing if that was causing bad outcomes in other instances, since his review was limited to grievance reviews. Id. (citing Plf's Additional SUMF, ¶¶ 13–17, 152). Plaintiff argues this created an unreasonable risk of inadequate medical care going unaddressed. Id. at 33–34. Plaintiff contends this custom of failing to identify and correct wrongdoing in grievances caused his harm by allowing deviations from the standard of care to continue unaddressed. Id.

Lastly, Plaintiff argues that Defendant Long's failure to undertake adequate investigations or correct apparent misconduct amounts to deliberate indifference. Id. at 34 (citing White, 500 F. Supp. 3d at 308). Plaintiff notes that Defendant Long's job included creating and enforcing policies that ensure adequate medical care is provided to the incarcerated population, and failing to do so despite awareness of patterns of misconduct allows a jury to find him liable. Id. (citing Figueroa, 2012 WL 3756974, at *11; Kelley, 2025 WL 618207, at *20).

c. Analysis

As discussed, Plaintiff alleges a policy-practice-custom basis, whereby he argues that Defendant Long failed to identify or correct inadequacies in medical treatment and other wrongdoing by medical providers. Plf's Opp. at 29–34. However, as discussed, these allegations are insufficiently specific for supervisory liability. Barkes, 766 F.3d at 319–20. Defendant Long's role was limited to grievance reviews, and in his professional opinion, the care provided was "reasonable and appropriate" when Plaintiff was seen and treated by medical staff, his diet was monitored, and his BMI remained healthy. Long Dep. at 154:23–156:14, 164:9–165:21, 172:14–176:14, 180:8–181:5, 216:6–217:5. Defendant Long upheld inmate grievances when there were issues, such as when Plaintiff had a delay in being scheduled for sick call in December 2021 or acknowledged that seeing the specialist for a follow-up appointment was "a long time coming." See Plf's Exhibit 22 (Grievance # 960646); Plf's Grievances at 182 (Grievance # 1128954).

Further, as discussed, any "delays" in accessing medical care through specialist appointments was not due to any policy, practice, or custom of Defendant Long or the DOC. See Part V.B.1. There was nothing that Defendant Long could do if appointments were not available. Long Dep. at 70:11-24.

Plaintiff also has not established that Defendant Long failed to adequately respond to a pattern of past occurrences of injuries like Plaintiff's and has not demonstrated that the risk of constitutionally cognizable harm was "so great and so obvious that the risk and the failure of supervisory officials to respond" to support supervisory liability. Beers-Capitol, 256 F.3d at 136–37 (citing Sample, 885 F.2d at 1118). As discussed, Plaintiff's allegations are conclusory and the grievance forms from other inmates are unrelated to Plaintiff's medical conditions and lawsuit. See Plf's Additional SUMF, ¶¶ 34–48; Plf's Exhibit 44; Fed. R. Civ. P. 56(c)(1).

Thus, summary judgment is **GRANTED** in favor of Defendant Long as to Count II.

## VI. FIRST AMENDMENT CLAIMS

Next, in Counts IV and IX, Plaintiff brings claims under § 1983 for violations of the First Amendment against Defendants Walsh and Letizio. See ECF 81 at 54; ECF 132 at 14–15. Plaintiff alleges Defendants Walsh and Letizio took adverse action against him in retaliation for him filing grievances and this lawsuit. See ECF 81 at 54; ECF 132 at 14–15.

To state a First Amendment retaliation claim, a plaintiff must allege (1) that the conduct which led to the alleged retaliation was constitutionally protected; (2) that he suffered some "adverse action" at the hands of the prison officials; and (3) a causal link between the exercise of his constitutional rights and the adverse action taken against him. Rauser v. Horn, 241 F.3d 330, 333 (3d Cir. 2001). An "adverse action" is one "sufficient to deter a person of ordinary firmness from exercising his or her [constitutional] rights." Allah v. Seiverling, 229 F.3d 220, 225 (3d Cir.

2000) (internal quotations omitted). Once the plaintiff has made his *prima facie* case, the burden then shifts to the defendant prison officials to prove by a preponderance of the evidence that it "would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest." Rauser, 241 F.3d at 334.

### A. Count IV: 42 U.S.C. § 1983 – First Amendment Retaliation as to Defendant Walsh

#### 1. Defendant's Contentions

First, Defendant Walsh argues there was no adverse action against Plaintiff, as he made decisions regarding Plaintiff's treatment based solely upon his medical judgment and recommendations of consulting specialists. Medical Defs.' Mot. at 25–27; Medical Defs.' Reply at 12–15. Defendant Walsh argues he did not do anything to abuse authority or slant medical decision-making. Medical Defs.' Mot. at 27. Although Plaintiff believes that these decisions were made from animus due to grievances filed, Defendant Walsh contends there is no credible evidence to support Plaintiff's belief. Id. at 26; see also Medical Defs.' Reply at 12.

Second, Defendant Walsh argues that even if Plaintiff did suffer an adverse action, he would have made the same decisions regarding his treatment because he formed the medical opinion that Plaintiff was exaggerating his symptoms at times based upon his clinical presentation. Medical Defs.' Reply at 13–14. Defendant Walsh notes that the medical records recount disagreements that Plaintiff had with providers, as well as behavioral issues he displayed during visits. Medical Defs.' Mot. at 26–27. Regardless, Defendant Walsh contends that he continually provided medical treatment to Plaintiff at SCI-Phoenix, even if it was not what Plaintiff preferred. Medical Defs.' Reply at 13–14. Although Plaintiff argues that Defendant Walsh "downplayed" the seriousness of his medical problems, Defendant Walsh argues that is simply his opinion, given

the considerable records demonstrating the attention and treatment Plaintiff received for his complaints and Dr. Peniston's expert report, who opines that Defendant Walsh's treatment of Plaintiff was within the accepted standard of care. Id.

Lastly, Defendant Walsh argues there is no evidence that his actions deterred Plaintiff from filing grievances or making complaints, considering he continued to file grievances regularly through his release on or about July 8, 2025. Id. at 14–15. As such, Defendant Walsh contends that Plaintiff cannot substantiate a claim for retaliation. Id. (citing Allah, 229 F.3d at 225).

**2. Plaintiff's Contentions**

In opposition, Plaintiff argues that a reasonable jury could conclude that Defendant Walsh withheld medical treatment and mistreated Plaintiff because of this lawsuit and his grievances. Plf's Opp. at 43–47. Plaintiff argues that delaying or denying medical treatment is an adverse action sufficient to sustain a retaliation claim. Id. at 44 (citing Dews v. Pa. Dep't of Corr., No. CIV.A. 14-3048, 2015 WL 1033275, at *5 (E.D. Pa. Mar. 9, 2015) (Savage, J.)). Plaintiff contends Defendant Walsh does not point to any independent evidence that would suggest that his actions were medically appropriate. Id. at 45 n.14.

Specifically, Plaintiff argues that Defendant Walsh's own words and the unreasonableness of his actions demonstrate that he was motivated by Plaintiff's lawsuit. Id. at 45–46 (citing Mirabella v. Villard, 853 F.3d 641, 652 n.6 (3d Cir. 2017) (relying on an oblique reference to the plaintiff's threat of litigation)). For example, when Plaintiff asked him at sick call why there was so much tension between them, Defendant Walsh said it was because Plaintiff was "trying to sue" him. Id. at 47. Plaintiff contends that the other Defendants' unanimity regarding Defendant Walsh's "absurd application of the one-issue-per-sick-call rule" belies his claim that his actions "were taken for a legitimate medical purpose." Id. Moreover, Plaintiff argues Defendant Walsh's

downplaying of his symptoms despite their acknowledged objective basis is evidence from which a jury could conclude that he was motivated by retaliatory animus, not his "betterment." Id.

### 3. Analysis

Defendant Walsh does not dispute that Plaintiff has demonstrated constitutionally protected conduct, through grievances and the instant lawsuit. Medical Defs.' Mot. at 25–27; Plf's Opp. at 43 n.13. However, Plaintiff argues, but does not demonstrate, that he suffered an "adverse action." Rauser, 241 F.3d at 333. Although Defendant Walsh's comment that Plaintiff was "trying to sue him" was improper, the Court finds that it does not rise to the level of an adverse action and Plaintiff was not deterred from continuing to file grievances or inmate requests to staff. See id. As Defendant Walsh testified, and the medical records establish, Plaintiff sometimes disagreed with the medical providers and refused to allow providers to examine him at sick call. Plf's Medical Records at 33–34, 107, 445, 616–17, 665, 675–76, 680, 685–86; Medical Defs.' SUMF, ¶¶ 55, 107; Walsh Dep. at 153:22–154:23). The records demonstrate Defendant Walsh continually provided medical care to Plaintiff, even if it was not what Plaintiff preferred, and he did not delay or deny treatment to Plaintiff because of Plaintiff filing grievances. See Allah, 229 F.3d at 225.

Moreover, Defendant Walsh testified that he would have made the same decisions regarding Plaintiff's medical treatment (including the application of the "one issue per sick call" rule) because he believed that Plaintiff was exaggerating his symptoms at times based upon his clinical presentation. Romero, 827 F. App'x at 227–28; Rauser, 241 F.3d at 334; Plf's Medical Records at 18, 33, 84, 91–93, 98, 107, 112, 126, 288, 290, 445, 448, 456, 471, 478, 504, 597, 616, 666–69, 675; Walsh Dep. at 153:22–154:23. Thus, even if there was an "adverse action," Defendant Walsh has demonstrated that the same decisions would have been made for a legitimate penological purpose—Plaintiff's betterment. See Rauser, 241 F.3d at 334.

Accordingly, summary judgment is **GRANTED** in favor of Defendant Walsh as to Count IV.

**B. Count IX: 42 U.S.C. § 1983 – First Amendment Retaliation as to Defendant Letizio**

**1. Defendant's Contentions**

Defendant Letizio argues that, like Defendant Walsh, he made decisions regarding Plaintiff's treatment based solely upon his medical judgment and recommendations of specialists, and thus no "adverse action" was taken. Medical Defs.' Mot. at 25–27; Medical Defs.' Reply at 12–15. Although Plaintiff believes that these decisions were made from animus due to grievances filed, Defendant Letizio contends there is no credible evidence to support Plaintiff's belief. Medical Defs.' Mot. at 25. Defendant Letizio contends he would have made the same decisions regarding Plaintiff's medical care because he (1) attempted to obtain a GI consult despite being unaware of scheduling issues, (2) prescribed Ensure based upon Plaintiff's clinical presentation and weight, (3) directed Plaintiff to remain in the infirmary when his complaints required additional medical monitoring, and (4) prescribed medication as DOT for a limited basis when he needed to ensure that Plaintiff was correctly using the medication. Medical Defs.' Reply at 14; Letizio Dep. at 116:5-9, 116:23-24, 117:1, 219:9-16, 230:2-22.

Defendant Letizio notes that although Plaintiff's records recount disagreements and behavioral issues that Plaintiff had with medical providers during visits, he continually provided necessary treatment to Plaintiff through sick call, even if it was not what Plaintiff preferred. Medical Defs.' Mot. at 27. Defendant Letizio contends that although there may have been an adverse action, he would have made the same decisions regarding Plaintiff's treatment for his betterment. Id. (citing Rauser, 241 F.3d at 334).

Finally, Defendant Letizio argues there is no evidence that his actions deterred Plaintiff from filing grievances, as he continued to do so regularly through his release on or about July 8, 2025. Medical Defs.' Reply at 14–15 (citing Allah, 229 F.3d at 225).

**2. Plaintiff's Contentions**

In opposition, Plaintiff argues that a reasonable jury could conclude that Defendant Letizio withheld medical treatment and mistreated Plaintiff because of this lawsuit and his grievances. Plf's Opp. at 43–47. Plaintiff contends that Defendant Letizio took adverse action against him when he downplayed and refused to address his medical needs, instructed other staff to deny Plaintiff's requests for treatment, and failed to take necessary action to provide Plaintiff with access to a treatment plan for his condition. Id. at 44 (citing Dews, 2015 WL 1033275, at *5). Specifically, Plaintiff argues that Defendant Letizio interfered with the scheduling of his follow-up specialist appointment, refused to provide him with Ensure despite the specialist prescribing it, and interfered with the provision of the antibiotic prescribed by the specialist. Plaintiff argues these are all adverse actions that a jury could conclude would deter a prisoner of ordinary firmness from continuing to exercise their rights. Id. Plaintiff contends Defendant Letizio does not point to evidence that his actions were medically appropriate. Id. at 45 n.14.

Plaintiff further contends Defendant Letizio took adverse action against him when he placed him in the infirmary in April 2024 and this was motivated by his lawsuit. Id. at 44–47. Plaintiff argues Letizio has not pointed to any evidence to suggest that he would have placed him in the infirmary if not for this lawsuit, and his own comments demonstrate his true motivations. Id. Defendant Letizio acknowledged that placement in the infirmary is undesirable because it separates individuals from their possessions, friends, and regular living space and thus could be perceived as retaliatory. Plf's Additional SUMF ¶¶ 332–33; Allah, 229 F.3d at 225. Plaintiff

alleges Defendant Letizio stated explicitly that he was trying to gather "documentation [to be] used in court" and told Plaintiff that he was irritated with him, he did not believe his reports of his symptoms, and Plaintiff was not as smart as he thought he was. Plf's Opp. at 46–47; Plf's Additional SUMF, ¶¶ 333–35, 337–40. Plaintiff alleges Defendant Letizio confronted Plaintiff, his voice was raised, and he "grabb[ed]" him "in a way that immediately escalated [the situation]." Plf's Opp. at 46–47. Plaintiff alleges Defendant Letizio said that he was not concerned about lawsuits because he has "tons of lawsuits" against him and most get dismissed. Id. Plaintiff also alleges another staff person observed that Defendant Letizio had been motivated by his "personal feelings" toward him. Id.

Plaintiff contends Defendant Letizio learned about the lawsuit sometime in 2023, and it was then that he started making derogatory comments about Plaintiff, suggesting that he was exaggerating his symptoms, and repeatedly referenced this lawsuit. Plf's Opp. at 46; Plf's Additional SUMF, ¶¶ 228–30, 288–90, 307–10. Plaintiff contends Defendant Letizio's comments, along with the evidence that the care he interfered with was medically necessary (and knew it was) belie his argument that he would have made the same decisions absent the lawsuit. Plf's Opp. at 46.

**3. Analysis**

Considering the Third Circuit jurisprudence in totality, this exchange of emails creates factual issues as to what was said and what may have been the thinking of the participants in Plaintiff's treatment. See Fed. R. Civ. P. 56(c)(1); Plf's Additional SUMF, ¶¶ 286–345; ECF 167-13 ("Plf's Exhibit 52") (Plaintiff is "abusing the sick call process" and "is a huge manipulator"); Plf's Exhibit 55 (Plaintiff "is playing a game"); Plf's Exhibit 56 (noting that putting Plaintiff in the infirmary would be seen as retaliation and that his condition is "false"). Furthermore, the April

2024 incident is concerning to this Court, where Defendant Letizio allegedly grabbed Plaintiff and placed him in the infirmary. See ECF 167-20 ("Plf's Exhibit 59"); ECF 167-21 ("Plf's Exhibit 60"); Plf's Exhibit 61; ECF 167-23 ("Plf's Exhibit 63"). Although Defendant Letizio testified that he placed Plaintiff in the infirmary to make sure that he was taking his medication, Plaintiff has put forth evidence that this may have been pretextual and that Defendant Letizio let his personal feelings get in the way. Fed. R. Civ. P. 56(c)(1); Letizio Dep. at 230:2–234:6; Plf's Additional SUMF, ¶¶ 334–39.

Taking the evidence in the light most favorable to Plaintiff, the Court finds that summary judgment cannot be granted against Plaintiff on his retaliation claim as to Defendant Letizio. Anderson, 477 U.S. at 255. At this stage of the case, it is not clear whether there was, in fact, retaliation or whether this whole dispute demonstrated in these emails became moot in view of more important issues such as Plaintiff's actual physical condition, whether he was obese, and whether he was getting appropriate medical care.[18] A reasonable jury could find that Defendant Letizio retaliated against Plaintiff, and therefore, summary judgment is **DENIED** as to Defendant Letizio on Count IX.

## VII. ADA / RA CLAIMS

In Counts V and VI, Plaintiff also brings claims under Title II of the ADA, 42 U.S.C. § 12132, and Section 504 of the RA, 29 U.S.C. § 794. ECF 81 at 54–55. Plaintiff alleges that Defendants failed to provide him with reasonable accommodations for his disability, thus denying

[18] It is worth noting that assuming this case proceeds to trial, Plaintiff will then have the burden of proving his case including his claim of retaliation by the preponderance of the evidence, and in that setting, it is doubtful that the facts set forth in these emails will be sufficient to warrant submitting the retaliation claim to the jury. See Plf's Exhibit 52; Plf's Exhibit 55; Plf's Exhibit 56; Plf's Exhibit 59; Plf's Exhibit 60; Plf's Exhibit 61; Plf's Exhibit 63.

him the benefits of DOC's programs, services, and activities; and the DOC has exhibited deliberate indifference because they were aware that Plaintiff's rights were likely to be violated. Id.

Both Plaintiff and Commonwealth Defendants have moved for summary judgment on these claims. See Commonwealth Defs.' Mot.; ECF 159-2 ("Plf's Mot.").[19]

The ADA and RA prohibit discrimination based on disability. Thus, to state a claim under Title II of the ADA, a plaintiff must demonstrate that: (1) he is a qualified individual; (2) with a disability; and (3) who was excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or were subjected to discrimination by any such entity; (4) by reason of his disability. Williams v. Sec'y Pennsylvania Dep't of Corr., 117 F.4th 503, 527 (3d Cir. 2024) (citation omitted). "Disability" is defined as "a physical or mental impairment that substantially limits one or more major life activities of such individual," "a record of such an impairment," or "being regarded as having such an impairment." Id. at 527–28. The elements of a claim under Section 504 of the RA are the same, except that the plaintiff must also establish that the program in question received federal funding. Durham, 82 F.4th at 225. Furthermore, under the RA, the disability must be the sole cause of the discriminatory action, while the ADA only requires but-for causation. Id. at 226.

An ADA claim may proceed under any of the following theories of liability: (1) disparate treatment or intentional discrimination, (2) disparate impact, or (3) failure to make a reasonable accommodation. Affinity Healthcare Grp. Voorhees, LLC v. Twp. of Voorhees, No. 22-2769,

[19] As Plaintiff seeks summary judgment against only Defendant DOC as to Counts V and VI, Medical Defendants did not move for summary judgment on those claims. Further, Plaintiff seeks summary judgment as to all Defendants as to the Prison Litigation Reform Act's ("PLRA") administrative exhaustion requirement, limitation on damages, and limitations on attorney's fees, which Medical Defendants did not oppose. See ECF 166 ("Medical Defs.' Opp.") at 2. Commonwealth Defendants also noted that they raised no PLRA defenses, and thus any arguments related thereto cannot be extrapolated to them. See ECF 164-2 ("Commonwealth Defs.' Opp.") at 10–11.

2024 WL 195471, at *4 (3d Cir. Jan. 18, 2024) (nonprecedential) (citing Cmty. Servs., Inc. v. Wind Gap Mun. Auth., 421 F.3d 170, 176 (3d Cir. 2005)). Reasonable accommodations must give a disabled prisoner "meaningful access" to the program in question. Defreitas v. Montgomery Cnty. Corr. Facility, 525 F. App'x 170, 178 n.14 (3d Cir. 2013) (nonprecedential) (citing Alexander v. Choate, 469 U.S. 287, 301 (1985)). However, "reasonable accommodations" does not necessarily mean the plaintiff must receive his preferred accommodations. See id. at 179.

Moreover, where compensatory damages are sought, a plaintiff must also establish intentional discrimination. Matthews v. Pennsylvania Dep't of Corr., 827 F. App'x 184, 187 (3d Cir. 2020). To prove intentional discrimination, a plaintiff must establish at least "deliberate indifference," which requires both (1) "knowledge that a federally protected right is substantially likely to be violated," and (2) "failure to act despite that knowledge." Id. (citations and quotations omitted). A plaintiff can demonstrate that such a right was "substantially likely to be violated" by either alleging (1) "a failure to adequately respond to a pattern of past occurrences of injuries like [his]"; or (2) "facts that 'prove that the risk of ... cognizable harm was so great and so obvious that the risk and the failure ... to respond will alone support finding deliberate indifference.'" Id. (alterations in original).

**A. Count V: Title II of the ADA, 42 U.S.C. § 12132**

**1. Defendant DOC**

a. Defendant's Contentions

Defendant DOC argues it is undisputed that Plaintiff was given reasonable accommodations, including a single cell, a bathroom pass, and a high-protein, low-carbohydrate medical diet. Commonwealth Defs.' Mot. at 24–25; ECF 164-2 ("Commonwealth Defs.' Opp.") at 3–4. To the extent that there were any delays in treatment, the DOC argues that Plaintiff's

complaints relate to the actions of the medical professionals and may not be imputed to the DOC. Commonwealth Defs.' Mot. at 24–25; Commonwealth Defs.' Opp. at 8–9. For example, BHCS is not responsible for or oversight of special diets, as all grievances concerning special diets went to Food Services (even if the special diet is for a medical condition) and the dieticians (not BHCS) have final approval. Commonwealth Defs.' Opp. at 2 n.2. As to the single cell, Defendant Letizio recommended that Plaintiff would benefit from one, and thus no Commonwealth Defendant had any role in deciding whether he would be housed in a single cell. Id.; see also id. at 7.

Defendant DOC further contends that any delay in providing Plaintiff with a bathroom pass was due to Plaintiff's own failure to complete an Inmate Disability Accommodation Request Form explicitly asking for one until October 18, 2023. Commonwealth Defs.' Mot. at 24–25; Commonwealth Defs.' Opp. at 7. Moreover, the issuance of a "bathroom pass" is not a standard procedure statewide for DOC or specifically at SCI-Phoenix. Commonwealth Defs.' Mot. at 24; Commonwealth Defs.' Opp. at 8. Rather, the "bathroom pass" was a special accommodation invented specifically to satisfy Plaintiff's request, above and beyond what any other inmate was granted. Commonwealth Defs.' Mot. at 24; Commonwealth Defs.' Opp. at 8. Accordingly, there would have been no reason for any Commonwealth Defendant reviewing Plaintiff's request forms and grievances to guess that he was requesting or would need such a pass, without Plaintiff directly asking for one. Commonwealth Defs.' Mot. at 24; Commonwealth Defs.' Opp. at 8.

In opposition to Plaintiff's Motion, Defendant DOC argues there is no evidence that any failure of any DOC employee to honor or understand Plaintiff's reasonable accommodation of a "bathroom pass" was made *because of* Plaintiff's disability. Commonwealth Defs.' Opp. at 4–6 (citing Henrietta D. v. Bloomberg, 331 F.3d 261, 278 (2d Cir. 2003); DiFraia v. Ransom, 171 F.4th 622, 631–33 (3d Cir. 2026)). Defendant DOC contends that Defendants Benning-Smith and Long

had no power to decide how and if Plaintiff's bathroom pass would be used or to tell staff when to let Plaintiff go to the bathroom. Id. at 2 n.2.

Defendant DOC further argues that Plaintiff's citation to Pierce v. D.C., 128 F. Supp. 3d 250 (D.D.C. 2015), is misplaced, as that case stands for the proposition that it is the duty of covered entities under the ADA and RA to provide "necessary accommodations, without regard to whether or not the disabled individual has made a specific request for accommodation" where "the inmate's disability is obvious and indisputably known to the provider of services." Commonwealth Defs.' Opp. at 7–8. Defendant DOC argues Plaintiff's disability was not obvious or indisputably knowable to any DOC employee, nor would the need for accommodation or the specific type of accommodation needed be readily apparent without Plaintiff articulating what he needed in a "bathroom pass." Id. at 8.

In the alternative, Defendant DOC notes there are genuine disputes as to whether Plaintiff was provided with reasonable accommodations, including the timing of the accommodations, what factors contributed to such timing, whether such timing qualified as "delay," if the "delay" was reasonable, and who or what was ultimately responsible for the "delay." Id. at 10 n.9.

b. Plaintiff's Contentions

Plaintiff first argues that Defendant DOC is a public entity that receives federal funds, and Plaintiff, "is a qualified individual covered by Title II and Section 504" and has a disability (chronic GI conditions). Plf's Mot. at 6. Plaintiff argues he needed reasonable accommodations to ensure he had equal access to the DOC's services, programs, and activities, and to prevent the DOC's facially neutral policies from disparately impacting him on account of his disability. Id. at 8. By denying him these accommodations for months, Plaintiff contends that Defendant DOC discriminated against him based on his disability. Id. at 8–10.

Specifically, Plaintiff argues he was denied the benefits of toilet access by not having a single cell, along with not having the bathroom pass. Id. (citing Larson v. Eppinger, No. 20- 4997, 2021 WL 2659998 (S.D. Ohio Jun. 29, 2021) (inmate with uncontrollable bowel movements sufficiently stated a claim for failure to provide a "reasonable modification" under the ADA and the RA when his different accommodation was ineffective)). Plaintiff argues his requests to return to his cell to use the toilet were not always granted, which caused him to soil himself on several occasions. Id. at 9. Plaintiff further argues he needed a bathroom pass to ensure he was not excluded from recreation time, as SCI-Phoenix rules required that when inmates returned to their cell during recreation, they stay in their cells until the midpoint ("halftime") of the recreation period or, if the midpoint had passed, for the remainder of the period. Id. at 9–10. Plaintiff contends he missed recreation time on multiple occasions because officers would not let him back out of his cell after using the toilet, or he chose not to go to the yard or dayroom to avoid dealing with the likelihood of officers not letting him back in to use the toilet. Id.

Second, Plaintiff contends he needed reasonable accommodations because Defendant DOC's facially neutral policies and procedures disparately impacted him based upon his disability, and reasonable modifications were required. Id. at 10 (citing Williams, 117 F.4th at 529). Plaintiff contends because his GI condition made the DOC's general practice of housing two men to a cell more onerous on him than on non-disabled inmates, the DOC was required to provide him with a reasonable accommodation. Id. at 11. Likewise, the rules concerning when and how inmates could return to their cell to use the toilet and then resume recreation activities harmed Plaintiff more than non-disabled inmates, so Plaintiff argues that reasonable modifications were required. Id. Plaintiff contends that the fact that non-disabled inmates may have had to wait to use the toilet while their cellmate used it or missed some recreation time while they waited for "halftime" does

not alter the analysis because he was more negatively impacted by DOC's practices than inmates without disabilities. Id. Plaintiff argues DOC thus had a duty to make reasonable modifications to ameliorate any negative impacts. Id. at 12.

Plaintiff contends that Defendant DOC was on notice of his disability and need for accommodations and had an "affirmative obligation" to provide them. Id. at 16–17 (citing Montanez, 154 F.4th at 144; Williams, 117 F.4th at 529). Plaintiff contends Defendant DOC's claims that his disability was not "indisputably knowable to any employee of the DOC," is belied by the record because his condition and symptoms were well-documented in his medical records from the beginning of his incarceration and DOC staff, including Defendants Huner and Sipple, had access to his records. ECF 175 ("Plf's Reply") at 10–11. Plaintiff further argues it is undisputed that DOC policy permitted staff to provide a disability accommodation even in the absence of a specific request, and Plaintiff should not have been expected to explicitly state that a "bathroom pass" was what he needed. Id. at 11. Plaintiff argues making DOC officials aware of his disability and describing his needs should have been sufficient. Id.

In any event, starting in June 2022, Plaintiff contends he began explicitly and repeatedly requesting a bathroom pass, so Defendant DOC's suggestion that he never "clearly and directly ask[ed] for" one has no basis in the record. Id. Plaintiff argues there is no authority for the proposition that his failure to submit his request on a particular form absolves Defendant DOC from the ADA and RA. Id. at 11–12; see also Plf's Opp. at 48–49. Plaintiff contends Defendant DOC's denials of his request for a bathroom pass belie any assertion that they would have been willing to provide one if he had submitted the proper form, because what prompted the DOC to provide him with one was the intervention of his attorney. Plf's Reply at 12; Plf's Opp. at 48–49. Moreover, Plaintiff argues the officials who denied his requests never told him to submit the

request on a disability-accommodation form, demonstrating deliberate indifference. Plf's Reply at 11–12. Indeed, Plaintiff alleges that after he submitted the form, SCI-Phoenix ultimately provided him with a bathroom pass without completing the disability-accommodation process, and according to Defendant Long, a bathroom pass is not an accommodation that could have been approved through the accommodation request process. Id. Plaintiff argues no reasonable jury could conclude that it was his failure to request a bathroom pass on a specific form that caused the DOC's delay in providing him with this accommodation. Id.

Plaintiff next argues that Defendant DOC cannot meet its burden of proving that a single-cell designation and bathroom pass were not "reasonable" accommodations, and "fundamental alteration" is an affirmative defense. Plf's Mot. at 13–14 (citing Hovsons, Inc. v. Twp. of Brick, 89 F.3d 1096, 1103 (3d Cir. 1996); Frederick L. v. Dep't of Pub. Welfare of Pa., 364 F.3d 487, 492 (3d Cir. 2004); Helen L. v. DiDario, 46 F.3d 325, 337 (3d Cir. 1995)). Plaintiff argues that no reasonable jury could rule for Defendant DOC on this issue, as the fact that the DOC provided Plaintiff with a single-cell designation and a bathroom pass forecloses any argument that those accommodations constitute a fundamental alteration. Id. Plaintiff contends that single-cell designations are expressly contemplated by DOC policy as warranted for certain medical conditions, can be assigned at any time, and need not wait for an annual review. Id. at 14.

Furthermore, Plaintiff contends the evidence establishes deliberate indifference because DOC officials knew of his need for accommodations but failed to provide them for months. Id. at 15 (citing S.H. ex rel. Durrell v. Lower Merion Sch. Dist., 729 F.3d 248, 261, 263–64 (3d Cir. 2013)). Plaintiff contends that when, as here, prison staff are aware of an inmate's disability and need for accommodations, and fail to provide them, deliberate indifference is established. Id. Plaintiff argues that the fact that the DOC eventually provided him with a single-cell and bathroom

pass does not foreclose deliberate indifference, as delaying attending to an inmate's serious needs can constitute deliberate indifference. Id. at 15 n.6 (citing Rouse, 182 F.3d at 197; Williams, 117 F.4th at 529–31).

Specifically, Plaintiff contends that the evidence establishes Defendant DOC's knowledge and failure to act in four different ways. First, Plaintiff argues Defendant DOC failed to satisfy its affirmative duty to provide him with accommodations, given his known disability and the DOC's knowledge of his condition. Id. at 16–17 (citing Montanez, 154 F.4th at 148–49; Pierce, 128 F. Supp. 3d at 272). Plaintiff alleges the DOC was aware of his GI condition as early as September 9, 2021, when a nurse completed his "new reception screening" on his second day in custody, but failed to provide accommodations. Id. at 17. Over the next couple of months, while Plaintiff was at SCI-Smithfield and SCI-Camp Hill, he was seen by medical staff multiple times, reporting diarrhea and vomiting. Id. Plaintiff argues that Defendant Letizio eventually recommended a single-cell does not absolve the DOC, as decisions about single-cell designations are made by the DOC and can be assigned at any time. Plf's Mot. at 14; Plf's Reply at 9. Moreover, even if Defendant Letizio was responsible for the delay, Plaintiff contends Defendant DOC would still be liable because it has an "obligation to ensure compliance with Title II and Section 504 even when it contracts out the operation of [its] programs, services, or activities to third parties." Plf's Reply at 10 (citing Montanez, 154 F.4th at 149).

Second, Plaintiff argues the DOC was deliberately indifferent when it repeatedly denied his requests for a single-cell designation. Plf's Mot. at 17. Plaintiff contends that from early November 2021 through February 2022, he requested a single-cell designation over a dozen times, through various channels, and from various staff members. Id. He argues he submitted request slips, grievances, and two accommodation requests, and he also made his request orally to medical

providers. Id. Plaintiff argues it was not until March 2022 that he was finally provided with a single cell, and during the months when he was requesting it, staff told him he did not qualify, and Defendant Letizio determined that Plaintiff did not meet the criteria without speaking to him, examining him, or reviewing his medical records. Id. at 18–19 (citing Farmer, 511 U.S. at 843 n.8). Even with Defendant Letizio's recommendation, Plaintiff argues another three weeks went by before he was formally approved for a single cell. Id. at 19.

Third, Plaintiff contends Defendant DOC was deliberately indifferent when it refused to accommodate his need for access to a toilet when he was out of his cell. Id. Plaintiff argues the DOC had a duty to assess his need for additional accommodations. Id. (citing Montanez, 154 F.4th at 148; Pierce, 128 F. Supp. 3d at 272). Plaintiff alleges he explained in an accommodation request that he could not "be away from the toilet too long or too far," and therefore needed accommodations to "facilitate [his] inclusion in facility life," yet the DOC failed to consider providing him with a bathroom pass or other accommodations aside from a single-cell, despite allegedly knowing a single-cell designation would not address his concerns about being able to attend recreation and easily access a toilet when he did so. Id. Plaintiff contends the DOC's deliberate indifference continued after he explicitly requested a bathroom pass. Id. at 19–21 (citing Durham, 82 F.4th at 226). Plaintiff alleges he first requested a pass in June 2022 and repeatedly continued to do so, but the DOC failed to provide one for 18 months and only provided one after Plaintiff obtained counsel. Id.

Fourth, Plaintiff contends the responses to his requests for a bathroom pass demonstrate deliberate indifference. Id. at 20, 22. For example, in response to a grievance appeal, Defendant Sorber stated that "bathroom passes are not provided to inmates" and later testified that "[t]here is no bathroom pass. There is none. … Why should anybody have special treatment" and "if he is a

grown man and he needs to go to the bathroom, he goes to the bathroom. There is no reason for a pass to do that." Id. at 20; Sorber Dep. at 166:8–167:17. Similarly, Plaintiff alleges Defendant Sipple stated, "We do not issue bathroom passes" even though she was allegedly aware that Plaintiff's frequent need for the toilet would lead him to miss out on recreation time, given SCI-Phoenix's rules about returning to recreation from cells, but that "wasn't a concern" to her. Plf's Mot. at 20. Plaintiff alleges Defendant Long acknowledged that he should have been permitted to use the toilet when he needed to and that it would be medically inadvisable for a patient with his condition to try to hold in his bowel movements but yet affirmed the denial of his grievance seeking a bathroom pass and disclaimed responsibility for providing him an accommodation. Id. at 21.

Plaintiff further argues that even after providing a single-cell and bathroom pass, DOC staff were deliberately indifferent when they failed to honor those accommodations on several occasions. Id. at 21–23 (citing Durham, 82 F.4th at 226; Furgess v. Pa. Dep't of Corr., 933 F.3d 285, 292 (3d Cir. 2019)). For example, Plaintiff argues the DOC failed to honor his single cell for his colonoscopy prep in June 2023, as when Plaintiff reported to the infirmary, he alleges that staff members instructed him to enter a cell with three other men in it and only one toilet. Id. Plaintiff alleges he informed an officer that he had an accommodation for a single cell and would not be able to do the colonoscopy prep, which involves flushing out the intestines, in the shared cell. Id. Plaintiff alleges the officer responded, using profanity, that his accommodation did not matter in the infirmary and refused to contact a higher-ranking officer. Id. at 23. Plaintiff was marked as having refused the colonoscopy, and it had to be rescheduled, which took another four months. Id. Plaintiff argues that Defendant Huner testified that failing to provide Plaintiff with a single cell for his colonoscopy prep was a violation of the ADA, and prior to the rescheduled colonoscopy, she emailed several staff members and told them to give Plaintiff a single cell in the infirmary. Id.

Plaintiff argues the fact that she failed to do this the first time—and that the DOC did nothing to ensure his accommodation was honored—is evidence of deliberate indifference. Id.

Plaintiff next argues that the DOC's causation argument misconstrues the nature of his claims and the statutes' causation requirement. See Plf's Opp. at 49; Plf's Reply at 4–9 (citing Montanez, 154 F.4th at 148; Williams, 117 F.4th at 528; Durham, 82 F.4th at 226; Furgess, 933 F.3d at 291). Plaintiff argues it is the exclusion or denial of benefits that must be "by reason of disability," not the denial of accommodations, such as by demonstrating that he was denied reasonable accommodations that would have enabled him to access the benefits at issue, not that the accommodations themselves were denied by reason of disability. Plf's Reply at 5. Plaintiff contends that he is not required to establish that specific DOC staff members denied him accommodations because of his disability. Id. at 5–7 (citing Kiman v. N.H. Dep't of Corr., 451 F.3d 274 (1st Cir. 2006); Henrietta D., 331 F.3d at 278). Plaintiff further argues the Third Circuit has rejected the DOC's causation argument. Id. at 7–8 (citing Williams, 117 F.4th at 528–29; Furgess, 933 F.3d at 291). Plaintiff also contends that the DOC's reliance on DiFraia is misplaced, as there, the theory of liability was disparate treatment—the prison excluded him from a program because of his disability—not failure to accommodate. Id. (citing DiFraia, 171 F.4th at 632–33). Plaintiff argues his case is like Furgess, because he "faced worse conditions than other prisoners" because of his disability, and thus the DOC engaged in discrimination when it denied him reasonable accommodations by failing to give him a single-cell and a bathroom pass and failing to honor those accommodations once provided. Id. at 9.

Lastly, Plaintiff argues the DOC's argument that they eventually provided him with accommodations is insufficient, as delays in providing needed accommodations are no less actionable than denials. Plf's Mot. at 15 n.6; Plf's Opp at 48 (citing Williams, 117 F.4th at 529–

31; Rouse, 182 F.3d at 197; Haberle v. Troxell, 885 F.3d 171, 181–82 (3d Cir. 2018)). Moreover, Plaintiff contends that DOC officials' own words establish that they were denying them, not agreeing to provide them on a delayed basis. Plf's Opp at 48.

c. Analysis

Plaintiff is proceeding with a failure to make a reasonable accommodation theory. See Plf's Mot. at 8–10; Affinity Healthcare, 2024 WL 195471, at *4; Furgess, 933 F.3d at 287; Matthews, 827 F. App'x at 187–88; Williams, 117 F.4th at 529. The Parties do not dispute that Plaintiff is a qualified individual with a disability. Plf's Mot. at 6; Commonwealth Defs.' Opp. at 3 n.3. Although Plaintiff was eventually provided with a single cell and a bathroom pass, and the DOC does not dispute that these were reasonable accommodations, the Parties dispute whether these were delayed and/or denied. See Plf's Mot. at 15 n.6; Plf's Reply at 4–12; Commonwealth Defs.' Opp. at 4–9, 10 n.9; Montanez, 154 F.4th at 148 (citing Chisolm v. McManimon, 275 F.3d 315, 330 (3d Cir. 2001)) (affirmative duty to accommodate is triggered when the need for an accommodation becomes known, either because (1) he requests an accommodation or (2) his disability and need for an accommodation are open and apparent). Moreover, neither Plaintiff nor Defendant DOC have established that they are entitled to judgment as a matter of law.

Specifically, Plaintiff alleges he requested a single cell over a dozen times between November 2021 through February 2022 but did not receive one until March 2022, after Defendant Letizio recommended one. Plf's Mot. at 17–19. He argues his requests for a single cell were repeatedly ignored or denied, thus demonstrating deliberate indifference. Id. Plaintiff further argues he first requested a bathroom pass in June 2022 and continued to do so repeatedly, but the DOC failed to provide one for 18 months and only provided one after the Court appointed counsel in this case. Id. at 19–21. Plaintiff alleges that the June 2023 colonoscopy was delayed until

October 2023 after there was no single cell available in the infirmary and there were "four men in a cell for bowel prep to flush out, one toilet and no shower." Id. at 22–23. Plaintiff also contends that even after he got the bathroom pass, there were instances where officers did not allow him back into his cell when he needed it. Id. at 22.

On the other hand, the DOC disputes whether Plaintiff was provided with reasonable accommodations, including the timing of such accommodations, what factors contributed to the timing of such accommodations, whether such timing qualified as "delay," if the "delay" was reasonable, and who or what was ultimately responsible for the "delay." Commonwealth Defs.' Opp. at 10 n.9 (referencing Letizio Dep. at 124:24–125:15, 127:11-24 (delay caused by Defendant Letizio failing to give medical recommendation for a single cell); ECF 81, ¶¶ 363, 398 (delay in providing a bathroom pass caused by his own failure to complete an Inmate Disability Accommodation Request Form explicitly asking for one until October 18, 2023); Benning-Smith Dep. at 183:2–184:24; Sipple Dep., at 133:3–136:18 (issuance of a "bathroom pass" is not a standard procedure statewide for DOC or at SCI-Phoenix and was created to accommodate Plaintiff)). The DOC argues that the single cell was provided soon after Plaintiff requested one through the disability accommodation process. Commonwealth Defs.' Opp. at 4; Commonwealth Defs.' SUMF, ¶¶ 8–10. Plaintiff alleges he requested a single cell at SCI-Camp Hill in November 2021, which was denied because the officer could not locate the request and incontinence did not qualify. See ECF 160-17 ("Plf's Exhibit 16") (Grievance # 955035). However, Plaintiff requested a single cell at SCI-Phoenix in December 2021, which was denied in January 2022 as he did not meet the criteria, but granted in February 2022 after Defendant Letizio recommended one. Plf's Grievances at 1–8 (Grievance # 957742); ECF 160-21.

Similarly, the DOC argues that any delay in providing Plaintiff with a bathroom pass was due to his own failure to complete an Accommodation Request Form explicitly asking for one until October 18, 2023. Commonwealth Defs.' Mot. at 24. For the June 2023 colonoscopy, there were three other inmates in the cell, and it is unclear what the other inmates were in the infirmary for, so it is not necessarily true that all four men were in the cell for bowel prep and had to share the toilet. See Terra Dep. at 108:15–113:24. Defendant DOC also contends that if Plaintiff notified the officers that he needed to use the bathroom, he would be let in at any time, and if he left his door open, he could come right back out, but there is no evidence that Plaintiff told the officers that he needed to use the restroom or showed the officers his bathroom pass. See Sorber Dep., at 157:2–161:22; ECF 160-27 ("Plf's Exhibit 26") (Grievance # 993577); ECF 160-28 ("Plf's Exhibit 27") (Grievance # 1046957). The DOC further contends that Plaintiff's statements of having to wait 15–30 minutes for his cell to be opened when he asked to be let back in with his bathroom pass were inaccurate, as he would either complain to the unit officer a few minutes later that it was not open (see ECF 160-30 ("Plf's Exhibit 29") (Grievance # 1062616); ECF 160-34 ("Plf's Exhibit 33") (Grievance # 1106033); ECF 160-35 ("Plf's Exhibit 34") (Grievance # 1146901); ECF 160-36 ("Plf's Exhibit 35") (Grievance # 1148106)) or would walk to the bubble or around the unit instead of the cell door, thus missing the proper movement to be let into his cell (see ECF 160-31 ("Plf's Exhibit 30") (Grievance # 1066643); ECF 160-32 ("Plf's Exhibit 31") (Grievance # 1071212); ECF 160-33 ("Plf's Exhibit 32") (Grievance # 1074420)).

Accordingly, as to the merits of Count V, the Court will **DENY** Commonwealth Defendants' Motion as to the DOC and **DENY** Plaintiff's Motion. However, the Court will **GRANT** Plaintiff's Motion as to the PLRA's administrative exhaustion requirement and limitations on damages and attorney's fees, since it is unopposed. See Commonwealth Defs.' Opp.

at 10–11; Medical Defs.' Opp. at 2; Ray v. Kertes, 285 F.3d 287, 295 (3d Cir. 2002) (PLRA exhaustion is an affirmative defense).

### 2. Defendants Benning-Smith, Long, Terra, and Sipple

Plaintiff initially named Defendants Benning-Smith, Long, Terra, and Sipple in their official capacities in Count V. However, in Plaintiff's Motion and Consolidated Opposition, he notes that he is no longer pursuing injunctive relief, only damages. See Plf's Mot. at 3 n.1; Plf's Opp. at 3 nn.1–2. Accordingly, Plaintiff argues that the official-capacity claims are now redundant with the claim against the DOC. Plf's Opp. at 3 n.2 (citing Montanez, 154 F.4th at 145 n.6). Further, on reply, Plaintiff asks the Court to grant summary judgment in his favor against only the DOC. Plf's Reply at 1. Commonwealth Defendants noted in their Opposition that "Plaintiff has now conceded that the ADA claims against Defendants Benning-Smith, Long, Sipple, and Terra are improper and is consequently only pursuing this count against the DOC." Commonwealth Defs.' Opp. at 1–2.

Title II of the ADA does not provide for individual liability. See Talley v. Clark, No. 19-3078, 2023 WL 118470, at *1 n.2 (3d Cir. Jan. 6, 2023) (nonprecedential) (citing Emerson v. Thiel Coll., 296 F.3d 184, 189 (3d Cir. 2002)) (no ADA liability for individual employees of the DOC, as the ADA governs the prohibited actions of "employers and public entities," not employees or managers of the organizations); Childress v. Clark, No. 24-CV-2210, 2024 WL 3431991, at *2 (E.D. Pa. July 16, 2024) (**Baylson, J.**) (collecting cases). Therefore, summary judgment is **GRANTED** in favor of Defendants Benning-Smith, Long, Terra, and Sipple on Count V.

### B. Count VI: Section 504 of the RA, 29 U.S.C. § 794

#### 1. Defendant's Contentions

Defendant DOC's arguments for Count VI are the same as its arguments for Count V. See Commonwealth Defs.' Mot. at 22–25; see generally Commonwealth Defs.' Opp. Defendant DOC does not dispute that Plaintiff is a qualified individual with a disability. Commonwealth Defs.' Opp. at 3 n.3. Rather, it is undisputed that Plaintiff was given reasonable accommodations, including a single cell, a bathroom pass, and a high-protein, low-carbohydrate medical diet. Commonwealth Defs.' Mot. at 24–25; Commonwealth Defs.' Opp. at 3–4. To the extent that there were any delays in treatment, these complaints relate to the actions of medical professionals and may not be imputed to the DOC. Commonwealth Defs.' Mot. at 24–25; Commonwealth Defs.' Opp. at 8–9.

In opposition to Plaintiff's Motion, Defendant DOC further contends there is no evidence that any failure of any DOC employee to honor Plaintiff's reasonable accommodation of a "bathroom pass" was made *because of* Plaintiff's disability. Commonwealth Defs.' Opp. at 4–6.

Alternatively, Defendant DOC notes there are genuine disputes as to whether Plaintiff was provided with reasonable accommodations, including the timing of the accommodations, what factors contributed to the timing of the accommodations, whether such timing qualified as "delay," if the "delay" was reasonable, and who or what was ultimately responsible for the "delay." See Commonwealth Defs.' Opp. at 10 n.9.

#### 2. Plaintiff's Contentions

Plaintiff's arguments in support of his Motion are the same for Count VI as those for Count V. See generally Plf's Mot. Plaintiff argues that Defendant DOC's argument that they eventually provided him with a single cell and a bathroom pass is insufficient, as delays in providing needed

accommodations are no less actionable than denials. Plf's Mot. at 15 n.6; Plf's Opp at 48. Moreover, Plaintiff contends DOC officials' own words demonstrate that they were denying them, not agreeing to provide them on a delayed basis. Plf's Opp at 48.

Second, Plaintiff contends that the DOC was on notice of his disability and need for accommodations and had an "affirmative obligation" to provide them. Plf's Mot. at 16–17. Plaintiff argues there is no authority for the proposition that his failure to submit his request on a particular form absolves the DOC from the ADA and RA. Plf's Reply at 11–12; see also Plf's Opp. at 48–49. Plaintiff contends the DOC's denials of his request for a bathroom pass belie any assertion that they would have been willing to provide one if he had submitted the proper form, and what prompted the DOC to finally provide him with one was the intervention of his attorney. Plf's Reply at 12; Plf's Opp. at 48–49.

Lastly, Plaintiff argues the DOC mistakes the causation requirement, as the DOC's failure to provide him with reasonable accommodations for his disability "was discrimination against him 'by reason of his disability'" and no further causation showing is required. Plf's Reply at 4–7.

**3. Analysis**

Courts will generally consider ADA and RA claims together because "the substantive standards for determining liability are the same." Furgess, 933 F.3d at 288. As discussed above for Count V, there are disputed facts and neither Plaintiff nor Defendant DOC have established that they are entitled to judgment as a matter of law. Therefore, as to the merits of Count VI, the Court will **DENY** Commonwealth Defendants' Motion and **DENY** Plaintiff's Motion. However, the Court will **GRANT** Plaintiff's Motion as to the PLRA's administrative exhaustion requirement and limitations on damages and attorney's fees, since it is unopposed. See Commonwealth Defs.' Opp. at 10–11; Medical Defs.' Opp. at 2; Ray, 285 F.3d at 295.

## VIII. STATE LAW CLAIMS

Lastly, in Count VII, Plaintiff brings a claim for professional negligence and vicarious liability under Pennsylvania state law against Defendants Long, LeClerc, Letizio, and Bora Saika. ECF 81 at 55–56. Plaintiff alleges Defendants Long, LeClerc, Letizio, and Bora Saika had a nondelegable duty to act in accordance with the standard of care required by physicians and breached their duties as physicians by deviating from the standard of care in their treatment of Plaintiff, causing Plaintiff's harm. Id.

### A. Count VII: Professional Negligence and Vicarious Liability under Pennsylvania State Law

Medical malpractice, especially where the claim sounds in negligence, is "the unwarranted departure from generally accepted standards of medical practice resulting in injury to a patient, including all liability-producing conduct arising from the rendition of professional medical services." Toogood v. Rogal, 824 A.2d 1140, 1145 (Pa. 2003). Thus, for a medical malpractice claim, a plaintiff must establish: (1) a duty owed by the physician to the patient, (2) a breach of that duty by the physician, (3) that the breach was the proximate cause of the harm suffered, and (4) the damages suffered were a direct result of the harm. Id.

#### 1. Defendant Long

a. Defendant's Contentions

Defendant Long argues Plaintiff has failed to establish this claim because he did not breach any duty towards Plaintiff and did not have the power to act. Commonwealth Defs.' Mot. at 25–27 (citing Freed v. Geisinger Med. Ctr., 971 A.2d 1202, 1206 (Pa. 2009)). Plaintiff's allegations against Long are limited to him reviewing Plaintiff's grievances or requests. Id. at 26. Defendant Long further contends that supervisory liability is not appropriate, as he was not the supervisor of

the individuals who provided the care and § 1983 liability cannot be predicated upon *respondeat superior*. Commonwealth Defs.' Reply at 2 n.1.

Defendant Long argues the record confirms that none of Plaintiff's requests for a bathroom pass, diet, single cell, and scheduling to see a specialist were within his power to grant. Commonwealth Defs.' Mot. at 26–27. Defendants Benning-Smith and Long both testified that neither BHCS nor Defendant Long had any power to decide how and if Plaintiff's bathroom pass would be used or to tell SCI-Phoenix personnel to let Plaintiff use the toilet whenever he needs. Id. Defendant Benning-Smith also testified that BHCS is not responsible for special diets, as all grievances concerning special diets went to Food Services instead and dieticians have final approval. Id. Moreover, any decision regarding a single cell was not Defendant Long's, as Defendant Letizio recommended that Plaintiff would benefit from one. Id. Finally, Defendant Benning-Smith testified that no DOC employee, including Defendant Long, was involved with the specialist care approval process. Id.

Defendant Long further argues that Plaintiff has failed to demonstrate that he suffered any harm. Commonwealth Defs.' Reply at 17–19. Specifically, Defendant Long did not state that Plaintiff's conditions "require treatment from a gastrointestinal specialist on a regular basis[,]" as Plaintiff suggests; instead, it was the opposite—there was not much a gastroenterologist can do. Id. at 18 (citing Long Dep. at 134:6-21, 135:19–136:1). Defendant Long contends Plaintiff was being constantly monitored by medical staff at SCI-Phoenix, which has greater access to medical resources than most other DOC correctional institutions. Id. at 18–19. Plaintiff's BMI remained healthy, his diet was checked, and he could go to sick call whenever he liked. Id.

b. Plaintiff's Contentions

In response, Plaintiff argues Defendant Long is not entitled to summary judgment on this claim for the same reasons that a jury could find that he was deliberately indifferent to Plaintiff's medical needs. Plf's Opp. at 40 (citing Toogood, 824 A.2d at 1145; Farmer, 511 U.S. at 836). Plaintiff contends that Defendant Long owed Plaintiff a duty arising directly from the DOC's own nondelegable duty to provide adequate medical care to those in its custody. Id. at 41–43 (citing Estelle, 429 U.S. at 103; West, 487 U.S. at 56; Barkes, 766 F.3d at 326–27). Plaintiff argues Long, as the Chief of Clinical Services, was responsible for overseeing healthcare for everyone incarcerated in the DOC, and thus he owed Plaintiff a duty of care. Id. (citing Chimenti v. Wetzel, No. CV 15-3333, 2018 WL 3388305, at *13 (E.D. Pa. July 12, 2018) (Padova, J.) (genuine issue of material fact as to whether one of Defendant Long's predecessors owed a duty of care to prisoners)). Plaintiff concedes that Defendant Long may not be vicariously liable for all negligent treatment if he was not involved. Id. at 42. However, Plaintiff argues that here, Defendant Long is liable because he was involved in reviewing an ongoing course of inadequate treatment, failed to intervene, and denied a request for Plaintiff's accommodations. Id.

Plaintiff further contends that Defendant Long's testimony that "there was 'not much' that a gastroenterologist could have done for Plaintiff," is belied by his own testimony and evidence. Id. at 42–43. Defendant Long acknowledged that diet and medication are the primary tools for addressing symptoms like Plaintiff's, and a specialist could make recommendations about diet and medication, including medications that general practitioners might not think of. Id. (citing Plf's Additional SUMF, ¶¶ 75, 81). Plaintiff further notes that Defendant Long testified that when a patient's symptoms persist despite a general practitioner's treatment efforts, referral to a specialist is appropriate. Id. Moreover, Plaintiff argues that both Defendant Letizio and Plaintiff's expert

were adamant that ongoing specialist care was warranted for Plaintiff, and Defendant Long offers no expert evidence of his own to rebut this. Id.

c. Analysis

This claim is brought under Pennsylvania state law, which the Court has the power to hear under supplemental jurisdiction. 28 U.S.C. § 1367. But under § 1367(c), the Court may decline to exercise that jurisdiction. As the Court has granted summary judgment as to several of Plaintiff's claims, the Court believes that Plaintiff's state law professional negligence and vicarious liability claim would substantially predominate over the remaining claims and therefore, this Court declines to exercise supplemental jurisdiction over Count VII. 28 U.S.C. § 1367(c)(2). Accordingly, the Court **DISMISSES** without prejudice Count VII as to Defendant Long, such that Plaintiff is free to re-file this claim in state court. In dismissing, this Court expresses no opinion on the merits of this claim.

**2. Defendant LeClerc**

As noted, Plaintiff is no longer pursuing his claims against Defendant LeClerc and does not oppose the entry of summary judgment in his favor. See Plf's Opp. at 4 n.3. Therefore, summary judgment is **GRANTED** in favor of Defendant LeClerc as to Count VII.

**3. Defendant Letizio**

a. Defendant's Contentions

First, Defendant Letizio contends that this Court should not exercise supplemental jurisdiction over Plaintiff's state law claim. Medical Defs.' Mot. at 27–29. Second, Defendant Letizio argues he provided medical treatment that met or exceeded the accepted standard of care as addressed in his Eighth Amendment arguments and Statement of Facts. Id. at 28. Defendant Letizio also points to his medical expert, Dr. Peniston, who opines that his treatment of Plaintiff

was within the accepted standard of care. Id. (citing ECF 158-2 ("Peniston Expert Report")). As such, because Defendant Letizio did not breach his duty of care in Plaintiff's treatment, he argues that summary judgment should be entered in his favor. Id. at 29.

b. Plaintiff's Contentions

In response, Plaintiff argues Defendant Letizio is not entitled to summary judgment on this claim for the same reasons that a jury could find that he was deliberately indifferent to Plaintiff's medical needs. Plf's Opp. at 40. Plaintiff argues that Defendant Letizio's argument that his expert's opinion that the treatment he provided was within the standard of care entitles him to summary judgment is wrong. Id. First, Defendants' expert report is not competent summary judgment evidence because the expert did not sign it under penalty of perjury. Id. (citing Chruby v. Bearjar, No. 24-1200, 2025 WL 325751, at *3 n.3 (3d Cir. Jan. 29, 2025) (nonprecedential)). Second, even if Defendants' expert report is considered, it is refuted by Plaintiff's expert's report which explained in detail what the standard of care requires for a patient like Plaintiff and concluded that Defendant Letizio did not meet it because he "failed to ensure that Mr. Moses was evaluated by medical and dietary specialists in a timely fashion" and failed to ensure "that there was adequate follow-up and continuity of care." Id. at 40–41 (citing ECF 160-9 ("Pack Expert Report")). Plaintiff contends that disputes regarding the standard of care and whether it was breached "involve factual determinations as to the credibility of … competing experts' views," which are properly left for the jury to decide. Id. (citing Hickey v. Merritt-Scully, No. 4:18-CV-01793, 2022 WL 883851, at *11 (M.D. Pa. Mar. 24, 2022)).

c. Analysis

As discussed, the Court declines to exercise supplemental jurisdiction over this claim. 28 U.S.C. § 1367(c)(2). Therefore, the Court **DISMISSES** without prejudice Count VII as to

Defendant Letizio, such that Plaintiff is free to re-file this claim in state court. In dismissing, this Court expresses no opinion on the merits of this claim.

#### 4. Defendant Bora Saika

As noted, Plaintiff is no longer pursuing his claims against Defendant Bora Saika and does not oppose the entry of summary judgment in her favor. See Plf's Opp. at 4 n.3. Therefore, summary judgment is **GRANTED** in favor of Defendant Bora Saika as to Count VII.

## IX. CONCLUSION

In summary:

- Summary judgment is **GRANTED** on Count I as to Defendants Benning-Smith, Long, Sorber, Terra, Sipple, Huner, LeClerc, Letizio, Bora Saikia, and Walsh.
- Summary judgment is **GRANTED** on Count II as to Defendants Benning-Smith and Long.
- Summary judgment is **GRANTED** on Count IV as to Defendant Walsh.
- Summary judgment is **DENIED** on the merits of Count V as to the DOC and as to Plaintiff. However, the Court will **GRANT** Plaintiff's Motion as to the PLRA's administrative exhaustion requirement and limitations on damages and attorney's fees. Furthermore, summary judgment is **GRANTED** in favor of Defendants Benning-Smith, Long, Terra, and Sipple on Count V.
- Summary judgment is **DENIED** on the merits of Count VI as to the DOC and as to Plaintiff. However, the Court will **GRANT** Plaintiff's Motion as to the PLRA's administrative exhaustion requirement and limitations on damages and attorney's fees.

- Summary judgment is **GRANTED** on Count VII as to Defendants LeClerc and Bora Saika. The Court **DISMISSES without prejudice** Count VII as to Defendants Long and Letizio, such that Plaintiff is free to re-file these claims in state court.
- Summary judgment is **DENIED** on Count IX as to Defendant Letizio.

The Court commends Plaintiff's Counsel for its very diligent representation and laudable efforts in this difficult and complex case, where a former inmate claims violations of his constitutional rights. The Court strongly recommends that Counsel for the Parties confer with an objective of settling this case entirely, as a trial in this matter would be very lengthy and complex for a jury to hear and decide.

An appropriate order follows.

\\adu.dcn\paed\PHL-DATA\Judge_Baylson\CIVIL 22\22-3385 Moses v. Sorber et al\22-3385 - Memo re MSJ (Final).docx